ACCEPTED
15-24-00111-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
4/30/2025 4:51 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00111-CV

In the Court of Appeals
for the Fifteenth Judicial District
Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
4/30/2025 4:51:25 PM
CHRISTOPHER A. PRINE
Clerk

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas**
*Appellants,*

v.

**Championx, LLC,**
*Appellees.*

On Appeal from the 419th Judicial District Court, Travis County, Texas
Cause Number D-1-GN-20-000139

## Appellants' Reply Brief

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney
General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

STEVEN ROBINSON
Division Chief, Tax Litigation
Division

KELSEY HANSON
Assistant Attorney General
State Bar No. 24096654
Kelsey.Hanson@oag.texas.gov

Office of the Attorney General
Tax Litigation Division
P.O. Box 12548 (MC 029)
Austin, Texas 78711-2548
Tel: 512-463-8897
Fax: 512-478-4013

*Counsel for Appellants*

**ORAL ARGUMENT REQUESTED**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................ii

INDEX OF AUTHORITIES ....................................................iv

RECORD REFERENCES ......................................................vi

ARGUMENTS AND AUTHORITIES ....................................... 1

I.    Texas Tax Code section 151.322 bars Champion's Containers from qualifying for the more general exemption under Texas Tax Code section 151.318. ........................................................ 2

    A. *East Texas Oxygen's* analysis applies to Champion's returnable and reusable Containers. .................................... 2

    B. The Container Exemption controls as the more specific provision. ............................................................ 3

    C. Champion's argument regarding irreconcilable conflict fails. ............................................................ 8

    D. There is no indication that the Legislature intended the Manufacturing Exemption to override the Container Exemption. ............................................................ 11

II.   Champion's Containers do not qualify for any exemption contained in the Manufacturing. ........................................... 12

    A. Champion's Containers do not qualify for a tax exemption under Texas Tax Code section 151.318 (a)(5). ...................... 13

    B. Champion's Containers do not qualify for a tax exemption under Texas Tax Code section 151.318 (a)(8). ...................... 15

    C. Champion's Containers do not qualify for a tax exemption under Texas Tax Code section 151.318 (a)(10). .................... 17

    D. Even if Champion can show its Containers satisfy the elements of the Manufacturing Exemption sections (a)(5), (a)(8), or (a)(10), Champion's Containers do not qualify for an

exemption because they are excluded pursuant to Texas Tax Code section 151.318(c). ....................................................... 18

E. The issue of whether Champion can satisfy the elements of the Manufacturing Exemption sections (a)(5), (a)(8), and (a)(10) has not been waived. ............................................... 20

III.   The services performed on Champion's Containers are not exempt from taxation pursuant to Texas Tax Code section 151.3111. ................................................................................ 21

PRAYER .................................................................................... 23

CERTIFICATE OF COMPLIANCE .................................................. 24

CERTIFICATE OF SERVICE .......................................................... 25

INDEX OF APPENDICES ............................................................... 26

**Cases**                                                               **Pages**

*City of West Lake Hills v. Westwood Legal Defense Fund,*
  598 S.W.2d 681 (Tex. App.—Waco 1980, no writ) .................................. 4

*Combs v. Health Care Servs. Corp.,*
  401 S.W.3d 623 (Tex. 2013) ..................................................................... 4

*Combs v. Roark Amusement & Vending, L.P.,*
  422 S.W.3d 638 (Tex. 2013) ..................................................................... 9

*East Texas Oxygen Co. v. State,*
  681 S.W.2d 741 (Tex. App.—Austin 1984, no writ) ........................ 2, 3, 6

*Farmland Industries, Inc. v. Moore,*
  596 S.W.2d 939 (Tex. App.—Waco 1980, no writ) .................................. 4

*Holmes v. Morales,*
  924 S.W.2d 920 (Tex. 1996) ..................................................................... 4

*Laredo Coco-Cola Bottling Co. v. Combs,*
  317 S.W.3d 735 (Tex. App.—Austin 2010, pet. denied) ........................ 20

*Sw. Royalties, Inc. v. Hegar,*
  500 S.W.3d 400 (Tex. 2016) ................................................................. 9, 20

*Townsend v. Terrell,*
  16 S.W.2d 1063 (Tex. 1929) ..................................................................... 6

**Statutes**
Tex. Gov. Code § 311.026 ........................................................................ 4, 5
Tex. Tax Code § 112.154........................................................................... 9
Tex. Tax Code § 151.005........................................................................... 5
Tex. Tax Code § 151.051........................................................................... 6
Tex. Tax Code § 151.101........................................................................... 6
Tex. Tax Code § 151.318...................................................................... passim
Tex. Tax Code § 151.322...................................................................... passim
Tex. Tax Code § 151.3111............................................................... 21, 22, 23

## Regulations

34 Tex. Admin Code § 3.300 ............................................................. 16, 22

34 Tex. Admin. Code § 3.1 .................................................................. 9, 10

34 Tex. Admin Code § 3.314 .................................................................. 4

## Other Authorities

Texas Policy Letter Ruling
No. 200108400L (Aug. 6, 2001) ....................................................... 8, 10, 11

## Tex. Sess. Laws

Acts 1999, 76th Leg., ch. 1467, § 2.19, eff. Oct. 1, 1999. ......................... 11

# RECORD REFERENCES

"CR1" refers to the clerk's record for Trial Court Cause No. D-1-GN-20-000139 dated November 22, 2024. "CR2" refers to the clerk's record for Trial Court Cause No. D-1-GN-21-000699 dated November 22, 2024. "CR3" refers to the clerk's record for Trial Court Cause No. D-1-GN-22-003715 dated November 22, 2024.

## ARGUMENTS AND AUTHORITIES

I.   **Texas Tax Code section 151.322 bars Champion's Containers from qualifying for the more general exemption under Texas Tax Code section 151.318.**

Champion is a chemical manufacturer seeking a sales and use tax exemption for its purchases of Containers used to deliver finished products to end-user customers. Champion uses its Containers to transport the completed chemical products to end-user customers. Champion's Containers are not exempt from sales and use tax under "the Manufacturing Exemption" codified in Texas Tax Code section 151.318 because the more specific exemption, "the Container Exemption" under Texas Tax Code section 151.322 bars Champion from qualifying for the Manufacturing Exemption. The Texas Legislature has set out a specific provision under which a manufacturer is exempt from paying sales tax under the Container Exemption. Tex. Tax Code § 151.322. Champion's Containers do not qualify for an exemption under the plain language of the Container Exemption. *Id.* A statutory construction principle requires a specific statute to control over a more general one. Since Champion's Containers do not qualify under the specific Container Exemption, they also cannot qualify under more general exemptions such as the ones contained in the Manufacturing Exemption. Even if the Manufacturing Exemption is

1

found to control over the Container Exemption, Champion's purchases of Containers still do not qualify for the Manufacturing Exemption as the Containers themselves are not used to manufacture the chemicals it sells to end user customers. *See* Appellants' Br. 17-22.

## A. *East Texas Oxygen's* analysis applies to Champion's returnable and reusable Containers.

*East Texas Oxygen Co. v. State* is the best authority addressing tax exemption claims for empty returnable containers. *See East Texas Oxygen Co. v. State, 681 S.W.2d 741 (Tex. App.— Austin 1984, no writ).* In that case, the taxpayer purchased empty returnable cylinders and filled the cylinders with oxygen that it sold to end users. *East Texas Oxygen Co. v. State*, 681 S.W.2d 741, 747 (Tex. App. —Austin 1984, no writ). The *East Texas Oxygen* court held that, in order to give meaning to Texas Tax Code section 151.322 and ensure that the returnable containers are taxed at some point, the provisions specifically dealing with the sale of containers constitute an exception to the general resale exemption for purchases for resale. *Id.* at 745.

Although Champion is not claiming a sale for resale exemption, *East Texas Oxygen's* analysis of the resale's applicability to returnable containers is relevant when addressing Champion's Containers for which

they are seeking a sales and use tax refund. Similar to *East Texas Oxygen*, Champion does not sell its Containers with the chemicals it manufactures but instead uses its Containers which it purchases and leases from third-party vendors as a means of transporting and delivering the chemicals it manufactures to end-user customers. CR1 141-142, 159, 208-209. Once Champion's Containers are emptied by end users, they are returned to be reused in Champion's chemical business. CR1 141-142, 210. The Legislature's policy is to impose sales tax at some point. *East Texas Oxygen Co. v. State*, 681 S.W.2d at 745. Further, Texas Tax Code section 151.322 ensures that tax is collected only once on a returnable container, not each time it is returned empty. *Id*. Accordingly *East Texas Oxygen* is the best authority addressing tax exemption claims for empty returnable containers like Champion's.

## B. The Container Exemption controls as the more specific provision.

There are two exemptions at issue in this appeal. The first is the Container Exemption. *See* Tex. Tax Code § 151.322. The second is the Manufacturing Exemption. *See* Tex. Tax Code § 151.318. When considering two statutes on the same subject, one general and one specific, the specific controls. *See Holmes v. Morales*, 924 S.W.2d 920, 923

(Tex. 1996); *see also Farmland Industries, Inc. v. Moore*, 596 S.W.2d 939 (Tex. App—Waco 1980, no writ); City *of West Lake Hills v. Westwood Legal Defense Fund,* 598 S.W.2d 681 (Tex. App.—Waco 1980, no writ).

The Texas Legislature has specifically defined when a manufacturer is exempt from paying sales tax on containers in the Container Exemption. *See* Tex. Tax Code § 151.322. As explained in Texas Administrative Code section 3.314(g)(3), a manufacturer must pay sales and use tax on its purchases of containers because its sales of the returnable containers are exempt from tax under Texas Tax Code section 151.322(a)(3). Additionally, the plain meaning of Texas Tax Code section 151.322 is applicable to the Containers on which Champion is claiming a tax exemption. The Texas Supreme Court has stated that "if a statute is worded clearly, we must honor its plain language, unless that interpretation would lead to absurd results." *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629 (Tex. 2013).

Champion cites the canon of statutory construction of *in pari materia,* codified in Texas Government Code section 311.026 alleging that the Manufacturing Exemption actually controls over the Container Exemption. Appellee's Br. 17-19. Texas Government Code section

311.026 provides that if a general provision conflicts with a special or local provision, the provisions should be construed if possible so that effect is given to both. Tex. Gov. Code § 311.026(a). Further, it provides if the conflict between the general provision and the special or local provision is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment, and the manifest intent is that the general provision prevail. Tex. Gov. Code § 311.026(b).

Champion's application of Texas Government Code section 311.026 to the Container Exemption and the Manufacturing Exemption is misguided. This appeal concerns evaluating the taxability of Containers which Champion purchases and leases from third-party vendors as a means of transporting and delivering the chemicals it manufactures to end-user customers. CR1 141-142, 159, 208-209. Specifically, at issue are the Manufacturing Exemption and the Container Exemption. *See* Tex. Tax Code §§ 151.322, 151.318. These two provisions certainly concern the same subject: Texas sales and use tax exemptions of a taxable item. *See* Tex. Tax Code §§ 151.322, 151.318; *see also* Tex. Tax Code §§ 151.005, 151.051, 151.101 (explaining Texas imposes sales and use tax on each

sale or use of a taxable item in the State). Consequently, section 151.318 and section 151.322 share a common purpose and the Container Exemption prevails over the Manufacturing Exemption. *Id.*

Champion also contends the Container exemption is broader because it applies to all taxpayers, whereas the Manufacturing Exemption only applies to manufacturers. Appellee's Br. 21-22. This argument ignores the reasons for imposing the Container Exemption: to ensure that tax is collected only once on a returnable container, not each time it is returned empty. *See East Texas Oxygen Co. v. State*, 681 S.W.2d 741, 745 (Tex. App.—Austin 1984, no writ). Therefore, the Container Exemption, which contains provisions specifically dealing with containers must prevail in order to comply with Legislative intent to ensure tax is only collected once on a returnable container. *Id*; *see also Townsend v. Terrell,* 16 S.W.2d 1063 (Tex. 1929) ("the specific statute more clearly evidences the intention of the legislature than the general one and, therefore, that it will control.").

Champion's Containers do not qualify for a tax emption as indicated by the plain language of section 151.322. The Container Exemption

provides three instances in which a container is exempt from sales and use tax:

> (1) a container sold with its contents if the sales price of the contents is not taxed under this chapter;
>
> (2) a nonreturnable container sold without its contents to a person who fills the container and sells the contents and the container together; and
>
> (3) a returnable container sold with its contents or resold for refilling.

Tex. Tax Code § 151.322(a).

Here, Champion cannot meet the any of these three instances. First, Champion admits the contents of its Containers – the chemicals it sells to end user customers – is taxed. *See* CR1 at 207. Consequently, it does not qualify for an exemption under Texas Tax Code section 151.322(a)(1). Next, Champion cannot qualify for an exemption under Texas Tax Code section 151.322(a)(2) because Champion is selling Chemicals – not Containers to its Customers. *See* CR1 158, 194. Once their customers take possession of the chemicals it purchased, then the Containers are cleaned and returned to Champion. CR1 141-142. Finally, Champion's Containers do not qualify for a refund under Texas Tax Code section 151.322(a)(3) because Champion does not sell the Containers with

its chemicals, instead the Containers are provided solely for temporary use of transporting and delivering the chemicals to end user customers. CR1 141-142, 159, 208-209. Therefore, Champion's purchase of its Containers are not exempt from sales and use tax under the Container Exemption because they are not exempt containers as contemplated under Texas Tax Code section 151.322.

Accordingly, the Container Exemption controls as the more specific provision to Champion's purchases of Containers and should be the exemption under which they are evaluated. Further, Champion's purchases of the Containers do not qualify for a sales and use tax refund under the Container Exemption.

### C. Champion's argument regarding irreconcilable conflict fails.

Champion spends much of its brief discussing past Comptroller decisions and past Comptroller policy letter rulings. Both of these types of decisions cited by Champion involve taxpayers who are not similar to Champion as the taxpayers in the decisions Champion relies on are not seeking a tax exemption on returnable and reusable containers. Champion's reliance on Texas Policy Letter Ruling No. 200108400L (Aug. 6, 2001) is misguide for multiple reasons and its argument regarding a

failure by Appellants to identify an irreconcilable conflict between the Container Exemption and the Manufacturing Exemption fails.

First, a private letter from the Comptroller such as this one is the Comptroller's written determination of how relevant tax laws, rules, and polices apply to a specific set of facts submitted in a properly completed private letter ruling request. *See* 34 Tex. Admin. Code § 3.1(a)(2). A person who receives a private letter ruling may rely on it prospectively from the date that the private letter ruling is issued and with respect only to the particular issue and the person identified in the request for the private letter ruling. *See* 34 Tex. Admin. Code § 3.1(d)(1). This letter is not directed to Champion and therefore cannot be relied on as being applicable to its Containers. *Id*.

Next, in a suit for tax refund the issues before the Court are to be tried de novo. *See* Tex. Tax Code § 112.154. Consequently, "regardless of the Comptroller's prior interpretations, [a question] of statutory construction 'ultimately is one left to the courts." *See Sw. Royalties, Inc. v. Hegar,* 500 S.W.3d 400, 408-09 (Tex. 2016) (citing *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d at 638 (Tex. 2013)). Champion's cited Comptroller policy letters are not binding on the Court because

unlike binding case law, these letters do not contain a fully developed factual record to be compared to the facts and law at issue in this appeal. *See* 34 Tex. Admin. Code § 3.1(a)(2). Therefore, Champion's reliance on the Comptroller's prior interpretations does not apply to proving it is entitled to the exemptions it seeks on its Containers.

Finally, even if a private letter ruling could aide Champion's argument, Champion's interpretation of this decision in Texas Policy Letter Ruling No. 200108400L (Aug. 6, 2001) is incorrect. In this Texas Policy Letter Ruling, the Comptroller found that the taxpayer, a manufacturer of cable products, could make tax-free purchases of returnable steel reels which the taxpayer used to ship its product to customers. *Id.* The taxpayer would store its cable on the reels and then ship the reels to customers. *Id.* The customer later returned the reels to the taxpayer once all the cable had been removed. *Id.* The Comptroller determined that the reusable reels qualified as wrapping, packing, and packaging supplies used to further the sale of the taxpayer's products and were, therefore, that taxpayer was eligible for a manufacturing exemption under Texas Tax Code section 151.318. *Id.* Champion argues this shows the Container Exemption under section 151.322 was no

obstacle to the Comptroller's decision in this policy letter. Appellee's Br. 21. Champion's interpretation of this decision is incorrect because reels for cables are not comparable to containers for chemicals. In the policy letter, the Comptroller determined the reels to be packaging, not containers. *See* Texas Policy Letter Ruling No. 200108400L (Aug. 6, 2001). Additionally, Champion's alleged reconciliation is unnecessary because of the gross differences between reels of cables and the Containers in this case.

### D. There is no indication that the Legislature intended the Manufacturing Exemption to override the Container Exemption.

Champion makes an argument that the Manufacturing Exemption controls over the Container Exemption because it was that latest-amended provision. In support of this argument Champion references 1999 legislation which modified the Manufacturing Exemption. Tex. Sess. Laws, Acts 1999, 76th Leg., ch. 1467, § 2.19, eff. Oct. 1, 1999.

However, Champion fails to mention that this same piece of legislation also modified exclusions contained in Texas Tax Code section 151.318(c) which excludes their containers from qualifying for the Manufacturing Exemption. *Id.* There is no indication in the text of the

statutes or the legislative history that the Legislature intended the Manufacturing Exemption to override the Container Exemption.

**II.    Champion's Containers do not qualify for any exemption contained in the Manufacturing Exemption under Texas Tax Code section 151.318.**

Champion contends it qualifies for an exemption for its Containers pursuant to three exemptions contained within the Manufacturing Exemption under Texas Tax Code section 151. 318. First, Champion alleges its Containers qualify for exemption under Texas Tax Code section 151.318(a)(5), "the Pollution Control Exemption", which provides exemption for property which is necessary and essential to pollution control processes. Next, Champion alleges its Containers qualify for exemption under Texas Tax Code section 151.318(a)(8), "the Quality Control Exemption", which provides exemption for property which is necessary and essential to the quality control process. Finally, Champion alleges its Containers qualify for exemption under Texas Tax Code section 151.318(a)(8), "the Public Health Requirements Exemption", which provides exemption for property which is necessary and essential to comply with public health requirements.

As explained in detail in Appellants' brief, Champion's Containers do not qualify for the Manufacturing Exemption as the Containers themselves are not used to manufacture the chemicals it sells to end user customers. See Appellants' Br. 17-22. Additionally, Champion cannot satisfy the elements of The Manufacturing Exemption under Texas Tax Code 151.318 sections (a)(5), (a)(8), and (a)(10), because it cannot show that the Containers are necessary and essential for pollution control, quality control, or satisfying public health requirements. However, even if Champion can satisfy the elements of Tax Code 151.318 sections (a)(5), (a)(8), and (a)(10), Champion's Containers still do not qualify for the Manufacturing Exemption because the Containers are specifically excluded pursuant to Texas Tax Code section 151.318(c).

## A. Champion's Containers do not qualify for a tax exemption under Texas Tax Code section 151.318 (a)(5).

First, Champion's Containers do not qualify for the Pollution Control Exemption which provides an exemption for tangible personal property used or consumed in the actual manufacturing of tangible personal property for ultimate sale if the use or consumption is necessary and essential to a pollution control process. *See* Tex. Tax Code § 151.318(a)(5).

Champion contends its Containers qualify for a sales and use tax exemption pursuant to Texas Tax Code section 151.318 (a)(5), because its Containers were used at the completion of its manufacturing process and because the Containers were used to prevent spills and chemical emissions for pollution control. Appellee's Br. 45. Further, Champion argues 151.318(a)(5) does not require simultaneous use for processing and pollution control to argue that the containers were used first for completion of the manufacturing process and then to prevent spills and chemical emissions. Appellee's Br. 46. In support of this argument, Champion relies on Texas Comptroller's Decision No. 115,803 (Jan 11, 2023). *Id*. This Comptroller Decision held that Saltwater Waste Disposal wells were not exempt because the oil (which was being manufactured and sold) was already extracted from the water prior to the water's disposal. *See* Tex. Comptroller's Decision No. 43,944 (Aug. 6, 2007). Since the Saltwater Waste Disposal wells were not used for processing or manufacturing, the ALJ determined that the exemption for pollution control process did not apply. *Id*.

Here, similar to Saltwater, Champion's chemicals were already manufactured prior to being transferred into its Containers. CR1 161,

205-206. Since the manufacturing is complete before transfer to the Containers, Champion cannot claim that the Containers are used to complete the already-complete process. Therefore, Champion's Container's do not qualify for exemption under Texas Tax Code section 151.318 (a)(5).

**B.      Champion's Containers do not qualify for a tax exemption under Texas Tax Code section 151.318 (a)(8).**

Next, Champion's Containers do not qualify for the Quality Control Exemption which provides an exemption for tangible personal property used or consumed in the actual manufacturing of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a quality control process that tests tangible personal property that is being manufactured for ultimate sale. *See* Tex. Tax Code § 151.318(a)(8).

Here, Champion's chemical manufacturing process consists of filling reactors with raw materials, blending the materials in the reactors, and if necessary, adding a catalyst such as a solid, liquid, or gas to initiate a chemical reaction. CR1 161, 205-206. Champion then tests the product to ensure it meets customer order specifications and industry

specifications. CR1 141, 206. The chemicals are then cooled so they are ready for transfer into the Containers. *Id.* Champion later tests the chemicals again after they are transferred to the Containers and claim because the testing is performed after the chemicals are filled into the Containers but before they are tagged and sealed that they are exempt under Texas Tax Code section 151.318(a)(8). Appellee's Br. 44. In support of this argument, Champion relies on 34 Texas Admin Code section 3.300(d)(9) which explains that the Manufacturing Exemption extends to equipment that is necessary and essential to quality control testing that occurs before wrapping and packaging. Appellee's Br. 44.

Champion's Containers do not qualify for tax exemption because the Containers are not necessary and essential to its quality control process for the manufacturing of Champion's chemical product which is what Champion is ultimately selling. Here, the necessary and essential quality control process that tests tangible personal property that is being manufactured for ultimate sale – Champion's chemical product – occurs when the chemicals have been manufactured and are still in the reactors before they are placed into the Containers. *See* CR1 141, 206. Any testing Champion does after the chemicals are in the Containers does not qualify

for Texas Tax Code section 151.318 (a)(8) either, because it cannot be said that the Containers are "necessary and essential" to the quality control process for the Chemicals as required by statute. *See* CR1 141, 206 (describing the process of testing the completed Chemicals prior to being placed in the Containers); *Compare* Appellee's Br. 44. (describing the process of the second testing of the completed chemical product.). Accordingly, Champion's Containers do not qualify for exemption under Texas Tax Code section 151.318 (a)(8).

### C. Champion's Containers do not qualify for a tax exemption under Texas Tax Code section 151.318 (a)(10).

Finally, Champion's Containers do not qualify for the Public Health Requirements Exemption which provides an exemption for tangible personal property used or consumed in the actual manufacturing of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health. *See* Tex. Tax Code § 151.318(a)(10).

Here, Champion's Containers are not used in the manufacturing, processing, or fabrication of the chemicals. Champion's chemical

manufacturing process consists of filling reactors with raw materials, blending the materials in the reactors, and if necessary, adding a catalyst such as a solid, liquid, or gas to initiate a chemical reaction. CR1 161, 205-206. Champion's Containers are then used to store and transport the chemicals to end user customers. CR1 141, 207. The manufacturing, processing, and fabrication is completed prior to the chemicals being transferred into the Containers. *Id*. Therefore, Champion's Containers do not satisfy the requirements to qualify for the Public Health Requirements Exemption because the Containers are not tangible personal property used or consumed in the actual manufacturing of the Chemicals Champion sells to end-user customers.

> **D. Even if Champion can show its Containers satisfy the elements of the Manufacturing Exemption sections (a)(5), (a)(8), or (a)(10), Champion's Containers do not qualify for an exemption because they are excluded pursuant to Texas Tax Code section 151.318(c).**

Appellants believe Champion cannot satisfy the elements of the Manufacturing Exemption sections (a)(5), (a)(8), and (a)(10). However, even if Champion could satisfy either section (a)(5), (a)(8), or (a)(10) of the Manufacturing Exemption, Champion's containers still do not qualify

for the Manufacturing Exemption because they are specifically excluded pursuant to Texas Tax Code section 151.318(c).

Champion's Containers are specifically excluded from the Manufacturing Exemption pursuant to the exclusions codified in Texas Tax Code section 151.318(c) as equipment used in distribution and transportation activities. Champion admits multiple times that its Containers are utilized for the purpose of transporting its chemicals to end-user customers. CR1 141, 207. Additionally, Champion admits that once the Containers are utilized for transporting the chemicals to end-user customers, that the customers may take possession of the chemicals (the product they purchased) and place them in their own tanks or containers. *See* Appellee's Br. 6; *see also* CR 209. This shows that the product end-user customers are ultimately purchasing are the chemicals and the Containers are merely a mechanism to transport them. *Id.* Further, Champion uses its transportation activities as a basis to try to argue that regulations followed in connection with transportation activities qualify them for a sales and use tax exemption. Appellee's Br. 39-42. Champion cannot argue a fact is true and then also allege as they have here that the Containers are "not equipment used in distribution

activities" or transportation activities' within the meaning of (c)(3). Appellee's Br. 48.

Because Champion's Containers are equipment utilized for distribution and transportation activities, they are excluded from the Manufacturing Exemption pursuant to the exclusion codified in Texas Tax Code section 151.318(c)(3).

### E. The issue of whether Champion can satisfy the elements of the Manufacturing Exemption sections (a)(5), (a)(8), and (a)(10) has not been waived.

Champion has a burden to clearly show it can satisfy the requirements of each of the exemptions it claims applies to its Containers. *See Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016). Doubts as to whether an exemption applies are resolved in favor of the Comptroller. *Laredo Coco-Cola Bottling Co. v. Combs*, 317 S.W.3d 735, 739 (Tex. App.—Austin 2010, pet. denied) (citations omitted).

Champion alleges the issue of whether it can satisfy the elements of the Manufacturing Exemption sections (a)(5), (a)(8), and (a)(10) has been waived by Appellants. Appellee's Br. 34-36. This is incorrect. The Final Judgment on appeal held that "the exemption for property used in manufacturing under Tex. Tax Code § 151.318 exempts the portafeed

20

drums, tanks, and totes [Champion's Containers] at issue from Texas sales and use tax". CR1 916-918. Texas Tax Code section 151.318 provides eleven different Manufacturing Exemptions. On appeal, Appellants argue as it did at the trial court level that the Appellee's containers do not qualify for any of the Manufacturing Exemptions. *See* Appellants' Br. 17-22.

Consequently, the issue of whether Champion can satisfy the elements of the Manufacturing Exemption sections (a)(5), (a)(8), and (a)(10) has not been waived by Appellants. Further, for the forgoing reasons, Appellants have demonstrated how Champion has failed to meet its burden to clearly show its purchase of Containers qualify for any of the three exemptions it seeks under the Manufacturing Exemption sections (a)(5), (a)(8), and (a)(10).

**III. The services performed on Champion's Containers are not exempt from taxation pursuant to Texas Tax Code section 151.3111.**

As explained in detail above, Champion's Containers do not qualify for a tax exemption under the Manufacturing Exemption sections (a)(5), (a)(8), or (a)(10). Because Champion's Containers are not exempt, the cleaning, delivery, pick-up, and repair services performed on Champion's

containers are also not exempt from tax pursuant to the exemption for services codified in Texas Tax Code section 151.3111.

Appellants do not agree that Champion's Containers are eligible for the Manufacturing Exemption at any stage. However, even if the Manufacturing Exemption did apply to Champion's Containers, the timing of the performance of the services prevents Texas Tax Code section 151.3111 from applying to Champion's containers. See Tex. Tax Code § 151.318; 151.3111.

The Manufacturing Exemption begins with the first stage of production, and logically ends after the product is completed. Tex. Tax Code § 151.318(d). It does not include acts in preparation for production. 34 Tex. Admin Code § 3.300(a)(9). The Cleaning Services done to the containers is not done during production. It is either an act done after use and consumption of the chemicals by the Plaintiff's customers or possibly an act done in preparation for production of new product. Therefore, since the Manufacturing Exemption would not apply to Champion's Containers at the time the Cleaning Services are performed, there is no sales and use tax exemption available for the Cleaning Services under Texas Tax Code section 151.3111(a).

Accordingly, the Court should hold that the cleaning and transportation services performed on the Containers are not exempt from taxation under Texas Tax Code section 151.3111.

## PRAYER

Appellants pray the Court reverse the trial court's judgment and render a take-nothing judgment on Champion's claims.

Respectfully submitted,

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney
   General

RALPH MOLINA
Deputy First Assistant
   Attorney General

AUSTIN KINGHORN
Deputy Attorney General for
   Civil Litigation

STEVEN ROBINSON
Division Chief, Tax Litigation
   Division

*/s/ Kelsey Hanson*
KELSEY HANSON
Assistant Attorney General
State Bar No. 24096654
Kelsey.Hanson@oag.texas.gov

Texas Office of the Attorney
General
Tax Litigation Division MC 029
P.O. Box 12548
Austin, Texas 78711-2548
Tel: 512-463-48897
Fax: (512) 478-4013

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief is computer-generated containing 4,267 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

*/s/ Kelsey Hanson*
KELSEY HANSON
Assistant Attorney General

## CERTIFICATE OF SERVICE

I certify that on April 30, 2025, a copy of the foregoing pleading was served on all parties or attorneys of record via the service methods listed below.

*Via Electronic Service and/or email:*

Deborah S. Sloan
dsloan@jonesday.com
JONES DAY
2727 N. Harwood Street, Suite 500
Dallas, Texas 75201-1515

John M. Allen
jmallen@jonesday.com
Antoinette L. Ellison
aellison@jonesday.com
JONES DAY
1221 Peachtree Street NE
Atlanta, Georgia 30361

**ATTORNEYS FOR APPELLEES**

*/s/ Kelsey Hanson*
KELSEY HANSON
Assistant Attorney General

# INDEX OF APPENDIX

**Appendix A** - City of West Lake Hills v. Westwood Legal Defense Fund, 598 S.W.2d 681 (Tex. App.—Waco 1980, no writ)

**Appendix B** - Combs v. Health Care Servs. Corp., 401 S.W.3d 623 (Tex. 2013)

**Appendix C** - Farmland Industries, Inc. v. Moore, 596 S.W.2d 939 (Tex. App.—Waco 1980, no writ)

**Appendix D** - Laredo Coco-Cola Bottling Co. v. Combs, 317 S.W.3d 735 (Tex. App.—Austin 2010, pet. denied)

**Appendix E** - Sw. Royalties, Inc. v. Hegar, 500 S.W.3d 400 (Tex. 2016)

**Appendix F** - Townsend v. Terrell, 16 S.W.2d 1063 (Tex. 1929)

**Appendix G** - Tex. Tax Code § 112.154

APPENDIX A - City of West Lake Hills v. Westwood Legal Defense Fund, 598 S.W.2d 681 (Tex. App.—Waco 1980, no writ)

598 S.W.2d 681
Court of Civil Appeals of Texas, Waco.

The CITY OF WEST LAKE HILLS, Texas, Appellant,

v.

WESTWOOD LEGAL DEFENSE FUND, Appellee.

No. 6157.
|
April 17, 1980.

**Synopsis**

City appealed from judgment entered in the 126th District Court, Travis County, James F. Dear, Jr., J., permanently enjoining city from enforcing by criminal action an ordinance requiring licensing of private sewage facilities located within city's extraterritorial jurisdiction. The Court of Civil Appeals, James, J., held that: (1) city could not enforce ordinance by criminal action; (2) city ordinance was not valid exercise of powers granted to city under statute allowing each city to pass ordinances regulating tapping of sewers and cesspools and regulating house draining and plumbing, or under statute generally granting to cities power to license; and (3) municipal court had no jurisdiction to try violations of ordinance which might occur in extraterritorial jurisdiction.

Affirmed.

West Headnotes (11)

**[1]** **Municipal, County, and Local Government** Express, implied, and incidental powers

**Municipal, County, and Local Government** Essential, indispensable, and necessary powers

A city can exercise only those powers that are expressly or impliedly conferred by law, and power will be implied only when such power is reasonably incident to those expressly granted or is essential to object and purposes of corporation.

4 Cases that cite this headnote

**[2]** **Municipal, County, and Local Government** Evidence

Any fair, reasonable, or substantial doubt as to existence of a power of municipality will be resolved against municipality.

**[3]** **Statutes** Statute as a Whole; Relation of Parts to Whole and to One Another

In construing a statute, it is duty of Court of Civil Appeals to examine entire act and construe it as a whole.

1 Case that cites this headnote

**[4]** **Statutes** Construing together; harmony

In construing a statute, one provision will not be given a meaning out of harmony or inconsistent with other provisions, even though it might be susceptible to such construction if standing alone.

7 Cases that cite this headnote

**[5]** **Municipal, County, and Local Government** Regulation of Private Conduct; Police Power

City could not enforce by criminal action an ordinance requiring licensing of private sewage facilities located within city's extraterritorial jurisdiction in light of specific assignment of powers of Water Commission and commissioners courts to license private sewage facilities which assignment limited more general grant of power to city to control and abate pollution and in light of fact that functions and services listed in statute granting city general power to control and abate pollution are in nature of "information gathering" functions. V.T.C.A., Water Code §§ 26.001 et seq., 26.031, 26.031(b), 26.032, 26.032(a, c), 26.177, 26.177(b)(3, 4).

1 Case that cites this headnote

**[6]** **Municipal, County, and Local Government** Private sewers and drains

When Water Code is viewed in its entirety, regardless of broad, general language of section generally granting power to cities to control and abate pollution, such section was not intended to authorize cities on their own initiative to regulate private sewage facilities by licensing such facilities. V.T.C.A. Water Code §§ 26.001 et seq., 26.031, 26.031(b), 26.032, 26.032(a, c), 26.177, 26.177(b)(3, 4).

1 Case that cites this headnote

**[7]** **Statutes** General and specific terms and provisions; ejusdem generis

As a general rule in construction of statutes, a general clause is limited or controlled by a special provision.

7 Cases that cite this headnote

**[8]** **Municipal, County, and Local Government** Express, implied, and incidental powers

**Municipal, County, and Local Government** Extraterritorial powers; territorial limitations

All powers granted to a city can only be exercised within corporate limits of city unless power is expressly extended to apply to areas outside such limits.

3 Cases that cite this headnote

**[9]** **Municipal, County, and Local Government** Private sewers and drains

City ordinance requiring licensing of private sewage facilities located within city's extraterritorial jurisdiction was not valid exercise of powers granted to city under statute allowing cities to pass ordinances regulating tapping of sewers and cesspools and regulating house draining and plumbing or under statute generally granting to city power to license in that such statutes did not expressly authorize regulations

applying outside corporate limits. Vernon's Ann.Civ.St. arts. 1015, subd. 39, 1076.

2 Cases that cite this headnote

**[10]** **Criminal Law** Municipal and other local courts

A municipal court may have jurisdiction to try offenses occurring outside corporate limits if offenses constitute violations of city ordinances which validly apply to area in which offense occurred.

**[11]** **Criminal Law** Municipal and other local courts

Municipal court had no jurisdiction to try violations of city ordinance requiring licensing of private sewage facilities located within city's extraterritorial jurisdiction, which violations may have occurred in extraterritorial jurisdiction, in light of fact that city had no authority to apply its licensing regulations in extraterritorial jurisdiction to regulate private sewage facilities. Vernon's Ann.Civ.St. art. 1195.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*682** John McAllen Scanlan, Scanlan & Buckle, Austin, for appellant.

David H. Walter, Bender, Walter & Wahlberg, Austin, for appellee.

OPINION

JAMES, Justice.

This is an appeal from a judgment permanently enjoining the Appellant, City of West Lake Hills, from enforcing by criminal action an ordinance which requires the licensing of private sewage facilities located within the city's extraterritorial jurisdiction. We affirm the judgment.

The Appellant, City of West Lake Hills, is a general law city having a population of less than 5000 people. On or about October 12, 1977, the City Council passed an ordinance, 108-B, attempting to control pollution flowing from private sewage facilities. Ordinance 108-B, among other things, sets forth standards for the operation and construction of private sewage facilities [1] and required inspection and licensing of all such facilities existing within the city's limits or within the city's extraterritorial jurisdiction. Inspections were to be made by the city for a fee of $25 unless an owner hired his own engineer or registered sanitarian to inspect the facility, in which case a fee of $15 would be levied to cover the cost of processing reports required to be submitted by a private inspector. If the facility met the express standards of the ordinance, a license immediately issued; if not, the city was required to specify the reasons for rejecting the application for license and the city was authorized to issue interim licenses while the facility was modified to comply with the standards. Most licenses were to be issued for a 5-year period, but a license could be revoked at any time for non-compliance. Enforcement of the ordinance was by criminal action brought in the city's municipal court. Offenses proscribed by the ordinance included, inter alia: 1) using or permitting the use of an unlicensed private sewage facility on property owned or possessed by the offender; and 2) failure of an owner to make application for a license for an existing private sewage facility on property within 90 days after notice by the city. Convictions were punishable by a fine of not more than $200 for each separate offense.

The evidence establishes that the ordinance in question was passed solely upon **\*683** the city's initiative and not as a joint effort between the city and any state or county authority.

The Appellee, Westwood Legal Defense Fund, is a coalition of homeowners, all of which reside in a subdivision known as Westwood, which is located entirely outside the corporate limits but within the extraterritorial jurisdiction of the City of West Lake Hills. The Appellee filed this suit to enjoin West Lake Hills from enforcing its Ordinance 108-B insofar as it applied to facilities located outside the city's corporate limits, pleading that the city lacks express or implied legislative authority to regulate by licensing any private sewage facilities located outside the city's corporate limits; that the ordinance is hopelessly in conflict with state law since the Legislature has granted exclusive authority for the regulation of private sewage facilities to the Texas Water Commission and the commissioners court of any county, citing Secs. 26.031

and 26.032 of the Texas Water Code; that the ordinance imposes a fine not to exceed $200 for any violation thereof, that such a fine is penal in nature and is prohibited by state law, citing Art. 970a, Sec. 4; that the penalty further conflicts with state law since Sec. 26.214 of the Texas Water Code provides the exclusive remedy as well as proper venue for violations of private sewage facility orders; that the scheme of the ordinance is arbitrary, capricious and unreasonable; that the ordinance represents a violation of the constitutional prohibition against the enactment of retroactive or ex post facto laws; and that the ordinance constitutes an unconstitutional taking of property without due process.

The case was submitted to the trial court on stipulated facts and written briefs and the court rendered judgment granting a permanent injunction prohibiting the City of West Lake Hills from enforcing by criminal action that provision of Ordinance 108-B which requires the licensing of private sewage facilities located within the city's extraterritorial jurisdiction. The trial court's judgment recited that "the CITY OF WEST LAKE HILLS, TEXAS, Ordinance 108-B is a valid exercise of legislatively granted powers to the CITY OF WEST LAKE HILLS, TEXAS, and that such Ordinance is in all respects valid and enforceable except as hereinafter set out:

"a. That DEFENDANT CITY OF WEST LAKE HILLS, TEXAS, Ordinance 108-B exceeds the authority granted to the DEFENDANT CITY OF WEST LAKE HILLS by the State of Texas only in its attempt to require the licensing of private sewage facilities in the DEFENDANT'S extraterritorial jurisdiction.

"b. That the Municipal Court of the CITY OF WEST LAKE HILLS, TEXAS, has no jurisdiction to try violations of Ordinance 108-B alleged to have occurred in the DEFENDANT CITY'S extraterritorial jurisdiction."
Further the judgment expressly recited that "Nothing contained herein should be interpreted as expressing any opinion over any of the provisions of Ordinance 108-B as they apply within the city limits of the CITY OF WEST LAKE HILLS, TEXAS."

The City appeals claiming simply that the court erred in finding its Ordinance 108-B invalid in the two respects set forth above. We overrule the City's contentions.

[1] [2] A city can exercise only those powers that are expressly or impliedly conferred by law, and a power will be

implied only when such power is reasonably incident to those expressly granted or is essential to the object and purposes of the corporation. Davis v. City of Taylor, 67 S.W.2d 1033, 123 Tex. 39 (1934); Anderson v. City of San Antonio, 67 S.W.2d 1036, 123 Tex. 163 (1934); Foster v. City of Waco, 255 S.W. 1104, 113 Tex. 352 (1923). Furthermore, any fair, reasonable, or substantial doubt as to the existence of a power will be resolved against the municipality. Foster v. City of Waco, cited supra. The City argues that the power exercised in Ordinance 108-B is in fact expressly or at least impliedly conferred by Sec. 26.177 of the Texas Water Code, which in its pertinent parts provides:

**\*684** "(a) Every city in this state having a population of 5,000 or more inhabitants shall, and any city of this state may, establish a water pollution control and abatement program for the city.

"(b) The water pollution control and abatement program of a city shall encompass the entire city and may include areas within its extraterritorial jurisdiction which in the judgment of the city should be included to enable the city to achieve the objectives of the city for the area within its territorial jurisdiction. The city shall include in the program the services and functions which, in the judgment of the city or as may be reasonably required by the commission, will provide effective water pollution control and abatement for the city, including the following services and functions:

"(1) the development and maintenance of an inventory of all significant waste discharges into or adjacent to the water within the city and, where the city so elects, within the extraterritorial jurisdiction of the city, without regard to whether or not the discharges are authorized by the department;

"(2) the regular monitoring of all significant waste discharges included in the inventory prepared pursuant to Subdivision (1) of this subsection;

"(3) the collecting of samples and the conducting of periodic inspections and tests of the waste discharges being monitored to determine whether the discharges are being conducted in compliance with this chapter and any applicable permits, orders or rules of the department, and whether they should be covered by a permit from the commission;

"(4) in cooperation with the department, a procedure for obtaining compliance by the waste discharges being monitored, including where necessary the use of legal enforcement proceedings; and

"(5) the development and execution of reasonable and realistic plans for controlling and abating pollution or potential pollution resulting from generalized discharges of waste which are not traceable to a specific source, such as storm sewer discharges and urban runoff from rainwater."

The city contends that this statute constitutes a broad, general grant of power to cities to formulate plans for the control of pollution and that such plans can reasonably include licensing of private sewage facilities and enforcement by criminal action. The city supports its argument by citing Attorney General's Opinion No. H-304 (1974), wherein the Attorney General concludes that:

> "A city has broad powers to establish water pollution control programs under (Sec. 26.177), Texas Water Code. These powers can include regulation of private sewage facilities in the city and in its extraterritorial jurisdiction."

**[3] [4] [5] [6]** In construing a statute, it is our duty to examine the entire act and construe it as a whole. One provision of a statute will not be given a meaning out of harmony or inconsistent with other provisions, even though it might be susceptible to such construction if standing alone. Merchants Fast Motor Lines, Inc. v. Railroad Commission of Texas, 573 S.W.2d 502 (Tex.1978); Barr v. Bernhard, 562 S.W.2d 844 (Tex.1978); Gerst v. Oak Cliff Savings & Loan Assn., 432 S.W.2d 702 (Tex.1968). For this reason we cannot accept the City's argument, nor can we agree with the Attorney General's Opinion to the extent that it may support the City's position in this case. If Sec. 26.177 of the Texas Water Code were the only statutory provision relating to the control and abatement of pollution, there might be some merit to the argument. However, Sec. 26.177 is only one provision in a much more complex and comprehensive legislative scheme. When Chapter 26 is viewed in its entirety, regardless of the broad, general language of Sec. 26.177, it is clear that the section was not intended to authorize cities on their own initiative to regulate private sewage facilities

by licensing such facilities. For example, 🚩Sec. 26.031 of the Texas Water Code, relating to "private sewage facilities," provides that:

**\*685** "(b) Whenever it appears that the use of private sewage facilities in an area is causing or may cause pollution or is injuring or may injure the public health, the commission may hold a public hearing in or near the area to determine whether an order should be entered controlling or prohibiting the installation or use of private sewage facilities in the area.

"(d) If the commission finds after the hearing that the use of private sewage facilities in an area is causing or may cause pollution or is injuring or may injure the public health, the commission may enter an order as it may consider appropriate to abate or prevent pollution or injury to public health.

"(f) The commission may provide in the order for a system of licensing of private sewage facilities in the area, including procedures for cancellation of a license for violation of this section, the license, or the orders or rules of the department. The commission may also provide in the system of licensing for periodic renewal of the licenses, but this may not be required more frequently than once a year.

"(g) The commission may delegate the licensing function and the administration of the licensing system to the executive director or to any local government whose boundaries include the area or which has been designated by the commission under Sections 26.081 through 26.086 of this code as the agency to develop a regional waste disposal system . . .

"(h) The board also may prescribe and require the payment of reasonable license fees. . . .

"(i) If the commission or the executive director has the responsibility for performing the licensing function, the license fees shall be paid to the department. . . .

"(j) If a local government has the responsibility for performing the licensing function, the fees shall be paid to the local government." (emphasis ours)

🚩Sec. 26.032 of the Texas Water Code further provides that:

"(a) Whenever it appears to the commissioners court of any county that the use of private sewage facilities in an area within the county is causing or may cause pollution or is

injuring or may injure the public health, the county may proceed in the same manner and in accordance with the same procedures as the commission to hold a public hearing and enter an order, resolution, or other rule as it may consider appropriate to abate or prevent pollution or injury to public health.

"(b) The order, resolution, or other rule may provide the same restrictions and requirements as are authorized for an order of the commission entered under this section.

"(c) Before the order, resolution, or other rule becomes effective, the county shall submit it to the commission and obtain the commission's written approval.

"(e) Where a system of licensing has been ordered by the commission or the commissioners court of a county, no person may install or use private sewage facilities required to be licensed without obtaining a license."

These two sections of the 🚩Water Code (Secs. 26.031 and 🚩26.032) specifically grant the power to license private sewage facilities to the Texas Water Commission and to the Commissioners Courts of Texas counties. On the other hand, Sec. 26.177, granting the power to "control and abate water pollution," does not specifically grant the power to license such facilities nor does the language of Sec. 26.177 in any way track or resemble the language of 🚩Secs. 26.031 or 🚩26.032. Furthermore, 🚩Sec. 26.031 expressly states that the power to license may be delegated to a city by the commission. In order to give any effect to this specific provision, we would have to conclude that the power granted to the cities by Sec. 26.177 does not include the power that can be delegated by the Water Commission under 🚩Sec. 26.031.

**\*686** **[7]** The city contends that 🚩Secs. 26.031 and 🚩26.032 cannot be construed to limit the powers granted under Sec. 26.177 since neither 26.031 nor 26.032 expressly prohibits regulation of private sewage facilities by cities. As a general rule, however, in the construction of statutes a general clause is limited or controlled by a special provision. It is said that this rule is based upon the principle that a specific clause or statute more clearly evidences the intention of the Legislature. 🚩City of Baytown v. Angel (Houston 14th CA 1971) 469 S.W.2d 923, NRE.

In the instant case the specific assignment of the power to license private sewage facilities (Secs. 26.031 and 26.032) limits the more general grant of power to the cities. In our opinion it is clear that the Legislature intended to reserve to the State the ultimate power to regulate in the area of pollution control. Even though the counties have express authority to develop licensing requirements, such requirements must be approved by the state. Sec. 26.032(c). Even though the cities may assist in obtaining compliance with pollution standards, these efforts must be in cooperation with the Texas Department of Water Resources. Sec. 26.177(b)(4). Although the Legislature recognized the importance of cooperative efforts between state and local governmental bodies, the state is assigned responsibility for promulgating rules and regulations to control pollution problems. Sec. 26.177 lists five specific functions and services that are or may be assigned to the cities. None of these functions and services specifically requires passage of rules and regulations for controlling pollution. Instead, the functions and services listed in Sec. 26.177 are in the nature of "information gathering" functions which would ultimately be very valuable to assist the state in designing and in enforcing its rules and regulations. Sec. 26.177(b)(3), for example, expressly states that the city's inspection and collection services are designed to determine whether the discharges are meeting applicable permits, rules, or orders of the state department and whether they should be covered by a permit from the state commission. In our opinion, Sec. 26.177 requires (in the case of cities over 5000) or allows (in the case of cities less than 5000) cities to monitor pollution levels both in their corporate limits and in their extraterritorial jurisdictions. The information gathered in this monitoring could (or should) be used by cities in developing plans for growth and expansion, which may of course include consideration of problems in the extraterritorial jurisdiction. The information would further be vital to the initiation of action by the state under Sec. 26.031(b), or by the county under Sec. 26.032(a), if pollution problems were detected by the city in regard to private or public sewage facilities within or surrounding the city. However, the legislative scheme simply does not contemplate independent regulatory action by a city.

[8] [9] The city argues alternatively that Ordinance 108-B is a valid exercise of powers granted to it under Art. 1076 and Art. 1015(39), R.C.S. Art. 1076 directs that "Every city in this State, however organized, having underground sewers or cesspools, shall pass ordinances regulating the tapping of said sewers and cesspools, regulating house draining and plumbing"; and Art. 1015(39) is a general grant of the power to license. All powers granted to a city can only be exercised within the corporate limits of a city unless the power is expressly extended to apply to areas outside these limits. City of Sweetwater v. Hamner (Ft. Worth CA 1924) 259 S.W. 191, writ dismissed; Ex parte Ernest, 138 Tex.Cr.R. 441, 136 S.W.2d 595 (1940). The Appellees in this case only challenge the power of the city to regulate private sewage facilities located wholly within the city's extraterritorial jurisdiction rather than within the city's corporate limits. Neither Art. 1076 nor Art. 1015(39) expressly authorizes regulations applying outside the corporate limits and cannot therefore be relied on in this case. The question of the validity of Ordinance 108-B as it applies to facilities located within the city limits of City of West Lake Hills is not raised by this case and we do not decide that issue.

**\*687** [10] [11] The Appellant City assigns as a separate point of error the conclusion of the trial court that the municipal court has no jurisdiction to try violations of Ordinance 108-B alleged to have occurred in the extraterritorial jurisdiction of the city. As a general rule, a municipal court only has jurisdiction to enforce violations occurring within the corporate limits of the city. Art. 1195, R.C.S. A municipal court may, however, have jurisdiction to try offenses occurring outside the corporate limits if the offenses constitute violations of city ordinances which validly apply to the area in which the offense occurred. Treadgill v. State, 160 Tex.Cr.R. 658, 275 S.W.2d 658 (1955); Parker v. City of Ft. Worth (Ft. Worth CA 1955) 281 S.W.2d 721, no writ. Having found that the city had no authority to apply its licensing regulations in the extraterritorial jurisdiction, we must also hold that the municipal court has no jurisdiction to try violations of the ordinance which may occur in the extraterritorial jurisdiction.

Judgment of the trial court is affirmed.

AFFIRMED.

## All Citations

598 S.W.2d 681

**Footnotes**

1      "Private sewage facility" was defined as "any septic system, or other facility, system, or method for the storage, treatment, or disposal of sewage other than an organized disposal system." (An "organized disposal system" being "any public or private system for the collection, treatment, and disposal of sewage operated in accordance with the terms and conditions of a permit from the Water Quality Board.")

---

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX B - Combs v. Health Care Servs. Corp., 401 S.W.3d 623
(Tex. 2013)

KeyCite Yellow Flag - Negative Treatment

Distinguished by Cantu Enterprises, LLC v. Hegar, Tex.App.-Austin (3 Dist.), July 7, 2017

401 S.W.3d 623
Supreme Court of Texas.

Susan COMBS, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Petitioners,

v.

HEALTH CARE SERVICES CORPORATION, Respondent.

Nos. 11–0283, 11–0652.
|
Argued Feb. 27, 2013.
|
Decided June 7, 2013.

**Synopsis**
**Background:** Government contractor that administered two health-insurance programs brought two separate actions against state officials for a refund, under the sale-for-resale exemption, of sales tax that contractor had paid on expenses it incurred that were reimbursed by federal government. The District Court, 261st Judicial District, Travis County, 2010 WL 4660020, Orlinda L. Naranjo, J., determined that contractor was entitled to claimed refunds for the period of January 1, 1999, through December 31, 2003, and determined in other case that contractor was entitled to refunds for the period of December 1, 1988 through December 31, 1998.

Officials appealed. The Austin Court of Appeals, 2011 WL 1005419, Bob Pemberton, J., affirmed in one case. The Austin Court of Appeals, 2011 WL 2652141, J. Woodfin Jones, C.J., affirmed in the other case. The Supreme Court granted review and consolidated the cases.

**Holdings:** The Supreme Court, Willett, J., held that:

[1] sale-for-resale sales tax exemption applied to tangible personal property that, under title-transfer contractual provisions, contractor automatically resold to federal government as soon as the property was acquired, and to taxable services that contractor bought on behalf of federal

government, but not to tangible personal property leased by contractor in order to perform its contractual obligations to federal government; and

[2] statutory requirement, that a taxpayer who seeks sale tax refund under the sale-for-resale exemption show he has not collected the tax from someone else, does not also require taxpayer to show he has not been reimbursed for the tax.

Affirmed in part, reversed in part, and remanded.

West Headnotes (7)

[1] **Taxation** Retail sales; sales not for resale

Sale-for-resale sales tax exemption applied to tangible personal property that, under title-transfer contractual provisions, government contractor administering two federal health-insurance programs automatically resold to federal government as soon as the property was acquired; contractor bought tangible property for the purpose of transferring its title to federal government, and it was irrelevant that a second purpose of the sale was to acquire property that would be consumed in performing nontaxable services. V.T.C.A., Tax Code § 151.006(a)(1).

1 Case that cites this headnote

[2] **Statutes** Giving effect to statute or language; construction as written
**Statutes** Policy considerations; public policy

The Supreme Court reads unambiguous statutes as they are written, not as they make the most policy sense.

14 Cases that cite this headnote

[3] **Statutes** Plain language; plain, ordinary, common, or literal meaning
**Statutes** Relation to plain, literal, or clear meaning; ambiguity

If a statute is worded clearly, court must honor its plain language, unless that interpretation would lead to absurd results.

49 Cases that cite this headnote

**[4]** **Administrative Law and Procedure** Plain, literal, or clear meaning; ambiguity or silence

**Administrative Law and Procedure** Permissible or reasonable construction

Courts grant deference to an agency's reasonable interpretation of a statute, but a precondition to agency deference is ambiguity; an agency's opinion cannot change plain language.

18 Cases that cite this headnote

**[5]** **Taxation** Retail sales; sales not for resale

Taxable services that government contractor bought on behalf of federal government as administrator of two federal health-insurance programs fell within Texas's sale-for-resale sales tax exemption, even though the title-transfer contractual clauses did not transfer title to the taxable services to federal government; contractor bought the services and then immediately resold them to federal government, so services were resold in same form as they were acquired. V.T.C.A., Tax Code § 151.006(a) (1).

1 Case that cites this headnote

**[6]** **Taxation** Retail sales; sales not for resale

Sale-for-resale sales tax exemption did not apply to tangible personal property leased by government contractor in order to perform its contractual obligations in administering two federal health-insurance programs; using the property for the federal government contract was not the same as releasing the property to the federal government. V.T.C.A., Tax Code § 151.006(a)(1).

**[7]** **Taxation** Retail sales; sales not for resale

Statutory requirement, that a taxpayer who seeks sales tax refund under the sale-for-resale exemption show he has not collected the tax from someone else, does not also require taxpayer to show he has not been reimbursed for the tax. V.T.C.A., Tax Code §§ 111.104(f), 151.006(a) (1).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*624** Jim B. Cloudt, William J. "Bill" Cobb III, Office of the Attorney General, Taxation Division, Kevin D. Van Oort, Deputy Chief–Financial & Tax Litigation Div., David C. Mattax, Director of Defense Litigation, Office of the Attorney General, Daniel T. Hodge, First Asst. Attorney General, Greg W. Abbott, Attorney General of Texas, Kristofer S. Monson, Assistant Solicitor General, Jonathan F. Mitchell, Solicitor General, Office of the Attorney General, Austin, TX, for Petitioners Susan Combs.

David E. Keltner, Kelly Hart & Hallman LLP, Fort Worth, TX, Kennon Lathem Wooten, Scott Douglass & Mcconnico LLP, Quentin Doug Sigel, Mark W. Eidman, Ryan Law Firm, LLP, Ray H. Langenberg, Scott Douglass & McConnico, LLP, Austin, TX, for Respondent Health Care Service Corporation.

Brent Andrew Money, Scott Money Ray & Thomas, PLLC, Greenville, TX, for Amicus Curiae Texas Municipal League.

**Opinion**

Justice WILLETT delivered the opinion of the Court.

This tax-refund case concerns the Tax Code's sale-for-resale exemption, which grants purchasers of taxable goods and services a sales-tax exemption if they resell the items (since the ultimate purchaser will pay any tax due). Here, a government contractor seeks sales-tax refunds for purchases used to administer federal health-insurance programs. The question is one of scope: What categories of purchases qualify for the exemption?

Applying the Legislature's sale-for-resale definition and exemption language, we believe the contractor here is entitled to most of the claimed refunds. There are three

main categories of goods and services for which refunds are claimed: tangible personal property, taxable services, and leases of tangible personal property. We hold that the exemption applies to the tangible personal property and taxable services, but not to the leases of tangible **\*625** personal property, for the following reasons:

- *Tangible Personal Property.* The exemption applies even when, as here, the resale consists of bare title transfer of tangible personal property that is consumed by the taxpayer to perform nontaxable services. This holding reaffirms long-standing precedent that allowed federal contractors to claim the sale-for-resale exemption for tangible personal property subject to automatic title transfer. We hasten to note, however, that a 2011 Tax Code amendment likely alters this result moving forward.

- *Taxable Services.* Sale-for-resale of a taxable service can occur, as here, by directing that the service be performed for another party in return for consideration from that party.

- *Leases of Tangible Personal Property.* These fall outside the sale-for-resale exemption, as they are not resold unless they are re-leased or transferred in some other way to another purchaser.

Finally, we hold that reimbursement of a tax is not the same as collection of a tax. Thus, the requirement that a taxpayer who claims a refund show he has not collected the tax from someone else does not also require the taxpayer to show he has not been reimbursed for the tax. Accordingly, we affirm the court of appeals' judgment on all but the lease issue, which we reverse and remand to the trial court for further proceedings.

## I. Background

Health Care Services Corporation and its predecessor-in-interest, Blue Cross and Blue Shield of Texas, Inc. (collectively HCSC), contracted with the federal government to administer two health-insurance programs.[1] While performing these contracts, HCSC incurred expenses that were reimbursed by the federal government.

HCSC paid sales and use tax on some of these expenses and applied for a refund under the sale-for-resale exemption.[2]

The Comptroller denied the refund. HCSC brought two separate tax-refund suits, the first covering December 1, 1988 through December 31, 1998, and the second covering January 1, 1999 through December 31, 2003. The two cases were nearly identical except for minor variations in the specific property and services for which HCSC sought a sales-tax refund.[3] However, in both cases, HCSC claimed the sale-for-resale exemption for three general categories of property and services it used to perform the contracts: (1) tangible personal property (such as chairs, printers, and office supplies); (2) taxable services (such as printer repair services, landscape maintenance, and copier maintenance); and (3) **\*626** leases of certain tangible personal property (such as leases of computers, audio equipment, and printers).

In both cases, the court of appeals affirmed trial-court decisions that HCSC was entitled to the claimed refunds.[4] We consolidated the cases and issue this joint decision.

## II. Discussion

The Comptroller argues the sale-for-resale exemption is inapplicable and also that HCSC should have to prove the federal government did not already reimburse it for the sales tax for which it requests refunds.

We affirm in part, reversing solely on the leases of tangible personal property. HCSC is entitled to a sales-tax refund for the tangible personal property and taxable services but not for the leases of tangible personal property. Also, HCSC need not show whether the federal government reimbursed it for the taxes.

### A. Tangible Personal Property

 **[1]** At all relevant times, the Tax Code defined sale for resale as a sale of:

> tangible personal property or a taxable service to a purchaser who acquires the property or service for the purpose of reselling it [in certain geographical locations] in the normal course of business in the form or condition in

which it is acquired or as an attachment to or integral part of other tangible personal property or taxable service.[5]

The statute applies to the tangible personal property here. HCSC purchased the "tangible personal property" for the purpose of "reselling it ... in the normal course of business in the form or condition in which it [was] acquired." The trial court found that HCSC's normal course of business was performing federal government contracts, and the resale furthered those contracts. Further, the tangible personal property was automatically resold to the federal government as soon as it was acquired due to the title-transfer provisions.[6] Title transfer for consideration is one type of "sale."[7] Therefore, the property was resold (through title transfer) in the "form or condition in which it [was] acquired": the resale was automatic upon acquisition, so, naturally, the property was resold before HCSC had any chance to alter it.

The Comptroller asserts that 🚩Section 151.006(a)(1) requires the application of an **\*627** "essence of the transaction" test. The Comptroller's argument is essentially that the exemption should only apply if the *primary* purpose of the original sale is to resell "in the form or condition in which it is acquired or as an attachment to or integral part of other tangible personal property or taxable service." Here, the primary purpose of the original sale was to acquire property that would be consumed in performing a nontaxable service, so the exemption should not apply. This restrictive interpretation collides with the statutory text.

The exemption does not say (or even intimate) that the *primary* purpose of the sale must be for a particular kind of resale.[8] The statute merely says the sale must have "the purpose" of reselling in one of the specified ways; not "the primary purpose," "the main purpose," or "the important purpose." Here, HCSC bought tangible personal property for *the purpose* of transferring its title to the federal government; we know this was the purpose because it was an unavoidable result given the automatic title-transfer provision. It is irrelevant that a second purpose of the sale was to acquire property that would be consumed in performing the nontaxable services. Taking the Legislature at its word and giving the statute its plain meaning, the definition and exemption apply.

This plain-text analysis reaffirms our holding in *Day & Zimmermann, Inc. v. Calvert.*[9] That case involved a taxpayer, Day & Zimmerman, that contracted with the federal government "for the loading, assembling and packaging of ammunition and related components as well as the handling of the mechanics of procurement of all necessary materials, supplies, equipment and services."[10] The contract between Day & Zimmerman and the government contained an automatic title-transfer provision similar to the one here.[11] The Comptroller made a deficiency determination against Day & Zimmerman for the sales tax paid for "the tangible personal property, not including any of the component parts that went into the finished product, purchased and consumed by the operating contractor in the performance of its contract with the Federal Government."[12] We held that the sales tax for this property had to be refunded to Day & Zimmerman because the transaction fell within the sale-for-resale exemption. The sale happened when the tangible personal property was physically transferred from the vendor to Day & Zimmerman.[13] Then, because the definition of "sale" included title transfer for consideration, the resale happened when title to the property transferred **\*628** from Day & Zimmerman to the federal government.[14] *Day & Zimmermann* is thus completely consistent with our decision today, both in its holding and its reasoning.

We find unpersuasive the Comptroller's attempt to distinguish *Day & Zimmermann*. The Comptroller argues that *Day & Zimmermann* involved a contract where the "essence of the transaction" was selling goods, whereas the essence of the transaction here is selling nontaxable services to which 🚩Section 151.006(a)(1) does not apply. So, the Comptroller says *Day & Zimmermann* is consistent with her proposed essence of the transaction test. The difficulty with this reasoning is simply stated: *Day & Zimmermann* never mentions or alludes to any such test. Moreover, it's anything but clear whether the essence of the transaction was reselling tangible personal property (ammunition) or reselling services (assembly and packaging of ammunition).[15] If the essence of the transaction really mattered, we would expect a more detailed description of the contract's "essence." *Day & Zimmermann* did not contemplate an "essence of the transaction" test because no such discussion exists. Instead, *Day & Zimmermann* stands for the proposition that automatic title transfer upon purchase qualifies for the sale-for-resale exemption. *Day & Zimmermann* cuts squarely in HCSC's favor due to the analogous title-transfer provisions.

The Comptroller next urges that *Day & Zimmermann* was abrogated by amendments to the sale-for-resale statute. While conceding that "sale" is still defined to include bare transfer of title of tangible personal property for consideration, [16] she asserts that two amendments have changed the legal landscape and rendered *Day & Zimmermann* irrelevant: (1) a change to the definition of "sale for resale," and (2) a new provision dealing with certain transactions that mix the resale of tangible personal property with the resale of taxable services. Upon careful examination of the amendments, the Comptroller's argument fails.

*1. The Slight Definitional Change to "Sale for Resale" Does Not Abrogate* Day & Zimmerman *and Defeat the Exemption*

In *Day & Zimmermann,* the statutory definition of sale for resale was:

> A sale of tangible personal property to any purchaser who is purchasing said tangible property for the purpose of reselling it [in certain geographical locations] in the normal course of business either in the form or condition in which it is purchased, or as an attachment to, or integral part of, other tangible personal property. [17]

The statutory definition relevant to this case reads:

> [A sale of] tangible personal property or a taxable service to a purchaser who acquires the property or service for the purpose of reselling it [in certain geographical locations] in the normal course of business in the form or condition in which it is acquired or as an attachment to or integral part of other tangible personal property or taxable service. [18]

**\*629** Studying these similar statutes, it is difficult to understand the Comptroller's argument that the statutory definition has changed so much as to revoke *Day & Zimmermann.* The new version merely seems to recognize the fact that some services are now taxable in Texas, whereas they were not when *Day & Zimmermann* was decided almost forty years ago.

The Comptroller's main argument appears to be that adding the words "taxable service" throughout the definition makes it clear that tangible personal property cannot be considered "resold" if the property is merely used to provide a nontaxable service. After all, says the Comptroller, the definition doesn't mention *nontaxable* services. But the *Day & Zimmermann*-era statute similarly made it clear that tangible personal property could not be considered "resold" if it was merely used to provide a service because the definition did not mention *any* services.

The Comptroller also argues that the statutory change unambiguously requires (or, in the alternative, ambiguously allows) application of the "essence of the transaction" test. The trouble with this argument, again, is that the changes since *Day & Zimmermann* say nothing about the "essence of the transaction" test. We do not see how the revisions have introduced any ambiguity into the statute that would allow application of the "essence of the transaction" test when it did not apply in *Day & Zimmermann.* In sum, the definitional changes to "sale for resale" do not statutorily abrogate *Day & Zimmermann.*

*2. New* ⚑ *Tax Code Section 151.302(b) Similarly Does Not Abrogate* Day & Zimmerman *and Defeat the Exemption*

The Comptroller next argues that *Day & Zimmermann* was abrogated by ⚑ Section 151.302(b), which provides:

> Tangible personal property used to perform a taxable service is not considered resold unless the care, custody, and control of the tangible personal property is transferred to the purchaser of the service. [19]

But it is uncontested in this case that HCSC is asking for a refund for tax paid on tangible personal property used to perform a *nontaxable* service because administrative services are not listed as a taxable service in Section 151.0101(a). Tangible personal property used to perform a nontaxable service is outside the exception to the exemption created by ⚑Section 151.302(b); by its own terms, that section only applies to tangible personal property used to perform a *taxable* service.

**[2]** **[3]** Perhaps it seems strange to distinguish between taxable and nontaxable services in ⚑Section 151.302(b). After all, if HCSC had transferred bare title to the tangible personal property and then consumed it in performing a *taxable* service, HCSC would not be entitled to a reimbursement. However, we read unambiguous statutes as they are written, not as they make the most policy sense. If a statute is worded clearly, we must honor its plain language, unless that interpretation would lead to absurd results. The Comptroller urges deference to its interpretation, but we recently canvassed our articulations of the agency-deference doctrine and formulated this test:

> We have long held that an agency's interpretation of a statute it is charged with enforcing is entitled to "serious consideration," so long as the construction is reasonable and does not conflict with the statute's language.... In our "serious consideration" inquiry, we will generally uphold an agency's interpretation **\*630** of a statute it is charged by the Legislature with enforcing, so long as the construction is reasonable and does not contradict the plain language of the statute.... [T]his deference is tempered by several considerations: [the statute must be ambiguous, the agency interpretation must be the result of formal procedures, and the interpretation must be reasonable].[20]

**[4]** It is true that courts grant deference to an agency's reasonable interpretation of a statute, but a precondition to agency deference is ambiguity; "an agency's opinion cannot change plain language."[21] There is no ambiguity about the ambiguity requirement, nor with the unassailable rule that agency interpretations cannot contradict statutory text. Here, the Comptroller's interpretation is contrary to the Tax Code. The statute unambiguously applies only to tangible personal property used to perform a taxable service. Further, it is not absurd for the Tax Code to treat nontaxable services more favorably than taxable services; indeed, the Tax Code already treats nontaxable services more favorably by not taxing them.

Summing up: As ⚑Section 151.302(b) explicitly applies only to tangible personal property used to perform taxable services, we decline the Comptroller's invitation to rewrite the statute to reach nontaxable services, too.

*3. Given the Statute's Clarity, the Comptroller's Unintended Consequences Arguments Are Unavailing*

The Comptroller contends the Legislature could not have intended to exempt HCSC from sales tax for items it consumed itself. Arguing that a plain-language interpretation of the exemption would produce unintended consequences, she asserts the "tie-pin" example: that HCSC should not be refunded sales tax on tie pins it bought to reward its employees for good work.

We recognize that statutes, framed in general terms, can often work peculiar outcomes, including over- or under-inclusiveness, but such minor deviations do not detract from the statute's clear import. If an as-written statute leads to patently nonsensical results, the "absurdity doctrine" comes into play, but the bar for reworking the words our Legislature passed into law is high, and should be. The absurdity safety valve is reserved for truly exceptional cases, and mere oddity does not equal absurdity. A sales-tax exemption for tie pins, even if unintended, even if improvident, even if inequitable, falls short of being unthinkable or unfathomable. The absurdity backstop requires more than a curious loophole. Indeed, given the complexity of modern tax laws (and the haste with which many are enacted), whimsical examples of over- or under-inclusiveness, likely wholly unintended, doubtless abound.[22] But pointing out a **\*631** quirky application is quite different from proving it was quite impossible that a rational Legislature could have intended it.

Since at least *Day & Zimmermann,* items consumed while performing a contract with a title-transfer provision have clearly been covered by the sale-for-resale exemption. If the Legislature considered this a loophole worth closing, it could have done so. In fact, lawmakers in 2011 narrowed it via ⚑ Section 151.006(c), which reserves this sale-for-resale exemption to contractors that are partnering with federal national security-related agencies. [23]

### B. Taxable Services

 **[5]**    The Comptroller argues that the taxable services that HCSC bought on the government's behalf fall outside the sale-for-resale exemption because the title-transfer clauses did not transfer title of the taxable services to the federal government. However, title transfer clearly is not the only way to bring about a resale. Instead, "sale" also includes "performance of a taxable service" for consideration. [24] Here, HCSC bought these taxable services (the sale). HCSC then resold the services to the government by directing that they be performed on the government's behalf with the purpose of receiving reimbursement and compensation (consideration) from the government (the resale). The sale-for-resale exemption explicitly includes the sale-for-resale of a service when it is resold "in the form or condition in which it is acquired." [25] Here, HCSC bought the services and then immediately resold them to the federal government, so the services were resold in the same form as they were acquired, thus qualifying for the sale-for-resale exemption.

The Comptroller attempts to recharacterize HCSC's sale-for-resale of services as sale-for-resale of service *contracts*. However, the trial court's findings of fact include findings that the services at issue  **\*632**  were performed on behalf of the federal government and that HCSC was compensated for them. Therefore, because the Comptroller has not challenged the evidentiary sufficiency of these factual findings, we accept them as a true characterization of the transfer. That is, the resale to the government was the performance of the services for consideration, not merely a resale of service contracts.

### C. Leases of Tangible Personal Property

 **[6]**    The Comptroller further argues that the leases of tangible personal property fall outside the sale-for-resale exemption.

After all, the Comptroller says, leases themselves are not tangible personal property, so sale-for-resale of a lease is not the sale-for-resale of tangible personal property. But "lease" is statutorily included in the definition of "sale." [26] Therefore, lease-for-(re)lease of tangible personal property falls within the definition of sale-for-resale of tangible personal property.

That said, there is no evidence here that HCSC leased the property for the purpose of *releasing* it. That is, using the property for the federal government contract is not the same as formally re-leasing the property to the federal government. The trial court pointed out that some leased property was transferred to the new contractor after HCSC's contract ended. But there is no finding or even allegation that HCSC's *purpose* in leasing the property in the first place was to re-lease it to the federal government or another contractor. Instead, the transfer of the leased property apparently only happened because the federal contract ended, not because the original purpose of leasing the property was to re-lease it. Thus, HCSC is not due a refund on sales tax paid on the leases.

### D. Documentation of Reimbursements

 **[7]**    HCSC is not required to produce documentation proving it did not receive federal government reimbursement for the sales tax it paid. Section 111.104(f) provides:

> No taxes, penalties, or interest may be refunded to a person who has *collected* the taxes from another person unless the person has refunded all the taxes and interest to the person from whom the taxes were *collected.* [27]

The Comptroller argues that this section imposes a burden on HCSC to show it was never reimbursed for the taxes it is seeking to have refunded. The Comptroller claims that HCSC can't prove that here. [28] But the statute precludes a refund only if HCSC *collected* a tax, not just if it was reimbursed some amount that may or may not include a tax. The Comptroller claims that being reimbursed for a tax is equivalent to collecting a tax. That is simply not the case. At all times relevant to this dispute, the Tax Code provided that a person who collects a tax holds that money in trust for the

State.[29] Such a trust relationship clearly did not exist here; the federal government did not pay HCSC tax for it to hold in trust and then remit to the State. Further, in the sales tax context, **\*633** tax is collected by a seller adding the sales tax to an initial sales price and then charging that amount to the buyer as part of the new sales price.[30] Such a collection process did not occur here.

That is, contrary to the Comptroller's argument, collecting a tax is not the same as reimbursing a tax. Hypothetically, a contractor and the federal government could agree for the government to pay ten percent of sales tax as part of the consideration for the contract; this would not mean that the contractor would "collect" ten percent of sales tax from the federal government. Instead, the sale price itself would go up by ten percent of the sales tax rate. Such a contract might actually be sensible if a federal contractor foresaw having to fight with the Comptroller to get a refund for the tax. A very similar (although less transparent) contractual arrangement may have occurred here; the federal government may have paid part of the sales tax price as part of the consideration for the contract.

However, if the federal government's contractual arrangement did not intend to pay HCSC for sales tax that was ultimately refunded, the federal government can likely recover the portion of the sales tax that it paid.[31] Therefore, the risk of HCSC receiving an unintended windfall at the federal government's expense is slight.

Regardless, though, as explained above, the statute designed to prevent double recovery (Section 111.104(f)) is inapplicable in light of the fact that HCSC never "collected" tax from the federal government, which is a prerequisite

for the statute's application.[32] Our statutory interpretation is reinforced by the fact that it makes sense from a policy perspective to prevent refund of tax only when it is explicitly collected from (i.e., charged as tax to) the buyer. After all, when such a tax is charged to a buyer, the buyer's understanding is that the portion of the sale attributed to tax will be paid to the government. The buyer also knows that any profit the seller makes in the transaction is through the sales price alone. On the other hand, with a lump sum charge to a customer that does not clearly delineate sales tax, the customer has no such expectation that a certain portion will be remitted to the State. It would also make very little sense to make federal government contractors write up transaction-by-transaction receipts with line items saying "Tax Collected = 0" for each transaction. Money is plainly and inarguably fungible, so even if the tax collected is listed as zero, federal contractors could just increase the amount they are paid under the contract to cover any money spent on sales tax. There is no reason to force contractors to engage in such creative accounting when the statute itself does not dictate that result.

### III. Conclusion

We affirm in part and reverse in part, holding that HCSC is entitled to a sales- and use tax refund for all the transactions except the leases of tangible personal **\*634** property. We remand to the trial court for further proceedings consistent with this opinion.

**All Citations**

401 S.W.3d 623, 56 Tex. Sup. Ct. J. 624

---

**Footnotes**

1    HCSC performed administrative services for two types of health insurance programs: Medicare and the Federal Employees Health Benefits Program. However, the contracts for both programs were virtually identical for the purposes of this opinion. So, all references in this opinion to "the contracts" are references to all contracts related to both programs, unless otherwise indicated.

2    For clarity, we will abbreviate "sales and use tax" to just "sales tax."

3    In the first trial, the specific property or services were: "Utilities," "Taxable Services on Tangible Personal Property," "Allowable," "Capitalized Assets," "Leases," "Maintenance on Tangible Personal Property," and

"Software/Software Maintenance." In the second trial, the specific property or services were: "Utilities," "Taxable Services on Tangible Personal Property," "Taxable Services on Real Property," "Allowable," "Leases," "Maintenance on Tangible Personal Property," "Maintenance on Real Property," and "Software/Software Maintenance."

4 —— S.W.3d ——; —— S.W.3d ——.

5 Act of May 27, 2007, 80th Leg., R.S., ch. 1266, § 2, 2007 Tex. Gen. Laws 4234, 4234 (amended 2011) (current version at TEX. TAX CODE § 151.006(a)(1)).

6 We note that the trial court concluded that the title-transfer provisions apply to all the tangible personal property transfers. The Comptroller does not contest this conclusion or argue that the title-transfer provisions were limited to certain types of transactions. Therefore, we treat all the tangible personal property purchases identically without independently analyzing whether the title-transfer provisions were applicable to all the transactions. We note, however, that the different contracts incorporated different title-transfer provisions. The earlier Federal Employees Health Benefits Program contracts incorporated the title-transfer provision found in Federal Acquisition Regulation 52.245–2, while later, amended Federal Employees Health Benefits Program contracts incorporated the title-transfer provision found in Federal Employees Health Benefits Acquisition Regulation 1652.245–70. The Medicare contracts all incorporated the title-transfer provision found in Federal Acquisition Regulation 52.245–5. As the parties have not raised the issue, we express no opinion on whether these different title-transfer provisions properly apply to all of the tangible personal property transfers at issue here. *See* TEX.R.APP. P. 55.2(i).

7 TEX. TAX CODE § 151.005(1).

8 We recently noted that "in the area of tax law, like other areas of economic regulation, a plain-meaning determination should not disregard the economic realities underlying the transactions in issue," and cited federal and Texas tax cases referencing "economic realities" or the "essence of the transaction." *Combs v. Roark Amusement & Vending, L.P.,* —— S.W.3d ——, —— & n. 14, 2013 WL 855737 (Tex.2013). However, we also made clear that if the statute does "not impose, either explicitly or implicitly," the "extra-statutory requirement" urged by the Comptroller, "we decline to engraft one-revising the statute under the guise of interpreting it." *Id.* at ——. We did not suggest that, in the guise of considering the economic realities or essence of the transaction, courts were authorized to impose an entirely new requirement for a tax exemption that simply is not found in the language of the statutory exemption.

9 519 S.W.2d 106 (Tex.1975)

10 *Id.* at 108.

11 *Id.* at 110.

12 *Id.* at 108.

13 *Id.* at 109–11.

14 *Id.* at 110.

15 *See id.* at 108.

16 *See* TEX. TAX CODE § 151.005(1).

17 *Day & Zimmermann,* 519 S.W.2d at 109.

18 Act of May 27, 2007, 80th Leg., R.S., ch. 1266, § 2, 2007 Tex. Gen. Laws 4234, 4234 (amended 2011) (current version at TEX. TAX CODE § 151.006(a)(1)).

19 TEX. TAX CODE § 151.302(b).

20 *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 624–25 (Tex.2011) (internal quotation and citation omitted).

21 *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 747 (Tex.2006).

22 Partly because of the title-transfer provision, the federal government likely could have demanded at any time that HCSC turn over all tangible personal property that wasn't consumed yet (even the tie pins). Indeed, the trial court found that when certain HCSC contracts expired, the federal government required HCSC physically to transfer any remaining tangible personal property to the new contractor. Title transfer was not a mere sham here; it had a real-world impact on HCSC. The federal government owned the tangible personal property, even if it lacked physical control over it. It thus makes some sense to shield HCSC from the tax burden for all property purchased to carry out the contracts.

23 *See* TEX. TAX CODE § 151.006(c) which provides:

> A sale for resale does not include the sale of tangible personal property or a taxable service to a purchaser who acquires the property or service for the purpose of performing a service that is not taxed under this chapter, regardless of whether title transfers to the service provider's customer, unless the tangible personal property or taxable service is purchased for the purpose of reselling it to the United States in a contract, or a subcontract of a contract, with any branch of the Department of Defense, Department of Homeland Security, Department of Energy, National Aeronautics and Space Administration, Central Intelligence Agency, National Security Agency, National Oceanic and Atmospheric Administration, or National Reconnaissance Office to the extent allocated and billed to the contract with the federal government.

*See also id.* § 151.006(a)(5) which provides that a "sale for resale" means:

> except as provided by Subsection (c), tangible personal property to a purchaser who acquires the property for the purpose of transferring it as an integral part of performing a contract, or a subcontract of a contract, with the federal government only if the purchaser:
>
> > (A) allocates and bills to the contract the cost of the property as a direct or indirect cost; and
>
> > (B) transfers title to the property to the federal government under the contract and applicable federal acquisition regulations.

Both of these subsections were added in 2011. Act of June 28, 2011, 82d Leg., 1st C.S., ch. 4, § 12.01, 2011 Tex. Gen. Laws 5263, 5263 (current version at TEX. TAX CODE § 151.006).

24 TEX. TAX CODE § 151.005(3).

25 Act of May 27, 2007, 80th Leg., R.S., ch. 1266, § 2, 2007 Tex. Gen. Laws 4234, 4234 (amended 2011) (current version at TEX. TAX CODE § 151.006(a)(1)).

26 TEX. TAX CODE § 151.005(2).

27 *Id.* § 111.104(f) (emphasis added).

28 In contrast, the trial court seemed to find some circumstantial evidence that the federal government had not reimbursed HCSC for the taxes because HCSC was operating at a loss.

29 TEX. TAX CODE § 111.016 ("Any person who receives or collects a tax or any money represented to be a tax from another person holds the amount so collected in trust for the benefit of the state and is liable to the state for the full amount collected plus any accrued penalties and interest on the amount collected.").

30 *Id.* § 151.052(a) ("COLLECTION BY RETAILER.... [A] seller who makes a sale subject to the sales tax imposed by this chapter shall add the amount of the tax to the sales price.").

31 *See Hercules Inc. v. United States,* 292 F.3d 1378, 1382–83 (Fed.Cir.2002) (when federal government contract incorporates certain Federal Acquisition Regulations, any state tax refund must be remitted to the United States in the same proportion that the federal government paid the original tax).

32 The Legislature *could* impose a record-keeping requirement when a tax is reimbursed rather than collected, but Section 111.104(f) does not do so.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX C - Farmland Industries, Inc. v. Moore, 596 S.W.2d 939
(Tex. App.—Waco 1980, no writ)

596 S.W.2d 939
Court of Civil Appeals of Texas, Waco.

FARMLAND INDUSTRIES, INC., Appellant,

v.

Bruce MOORE, Appellee.

No. 6133.
|
March 13, 1980.

**Synopsis**

Plaintiff brought action to recover for the loss of feeder hogs which allegedly died as a result of defective feed. The 74th District Court, McLennan County, Derwood Johnson, J., entered order overruling foreign defendant's plea of privilege, and defendant appealed. The Court of Civil Appeals, James, J., held that plaintiff met his burden of proving that defendant feed manufacturer was a foreign corporation with an agent or representative in the county of suit, and therefore, venue was established; because plaintiff pleaded causes of action for breach of express and implied warranties and for strict liability in addition to his cause of action under the Deceptive Trade Practices Act, the special venue provision of the Deceptive Trade Practices Act was not controlling.

Affirmed.

**Procedural Posture(s):** On Appeal.

West Headnotes (5)

**[1]** **Appeal and Error** Venue

**Appeal and Error** Review of rulings or orders before trial or hearing

On appeal from order overruling defendant's plea of privilege and sustaining plaintiff's controverting plea, defendant could not contend that plaintiff had abandoned his controverting plea by delaying approximately two years in setting venue hearing, since such point was raised for the first time on appeal and defendant had leveled no special exception and made no objection to plaintiff's controverting plea in trial court. Rules of Civil Procedure, rule 90.

**[2]** **Pleading** Foreign corporations, suits against

In order to establish venue in county of suit under statute governing venue over foreign corporations, plaintiff need only to prove that defendant is a foreign corporation with an agency or representative in the county of suit.

**[3]** **Pleading** Corporations and associations; foreign corporations

In action to recover for loss of feeder hogs which allegedly died as result of defective feed, plaintiff met his burden of proving that defendant feed manufacturer was a foreign corporation with an agent or representative in the county of suit, and therefore, venue was established; because plaintiff pleaded causes of action for breach of express and implied warranties and for strict liability in addition to his cause of action under the Deceptive Trade Practices Act, the special venue provision of the Deceptive Trade Practices Act was not controlling. Vernon's Ann.Civ.St. art. 1995, subds. 27, 30; V.T.C.A., Bus. & C. § 17.56.

**[4]** **Statutes** General and specific statutes

The general rule is that when the law makes a general provision, apparently for all cases, and a specific provision for a particular type case, then the general must yield to the specific.

**[5]** **Corporations and Business Organizations** Venue

Although as a general rule, foreign corporations authorized to do business in state may have the same rights and privileges as domestic corporations, in the special instance of venue, suits against foreign corporations are governed by a different provision from domestic corporations. V.A.T.S. Bus.Corp.Act, art. 8.02; Vernon's Ann.Civ.St. art. 1995, subds. 23, 27.

agency or representative in McLennan County, Texas. No further evidence was introduced at the hearing. The trial court entered an order overruling the plea of privilege from which Defendant Farmland appeals.

By its two points of error Appellant asserts error of the trial court in overruling **\*941** the plea of privilege because: (1) Plaintiff abandoned its controverting plea, and (2) Plaintiff failed to prove a cause of action. We overrule both points of error and affirm the trial court's judgment.

**[1]** We revert to Appellant's first point, wherein it is contended that Plaintiff "abandoned" his controverting plea since he delayed approximately two years in setting the venue hearing. This point is raised for the first time on appeal. Defendant-Appellant Farmland levelled no special exception and made no objection to Plaintiff's Controverting Plea in the trial court, and therefore has waived such defect. Rule 90, Texas Rules of Civil Procedure; Hanover Insurance Co. v. Richardson (Houston 1st CA 1975) 529 S.W.2d 608, writ dismissed; Great Southwest Life Ins. Co. v. Camp (Fort Worth CA 1971) 464 S.W.2d 702, no writ.

**[2]** **[3]** Appellant asserts in its second and remaining point that the trial court erred in overruling its plea of privilege because Plaintiff failed to prove a cause of action. This point is without merit, because Appellant admits, and it is well settled, that in order to establish venue in the county of suit under Subdivision 27 of Article 1995, Plaintiff need only to prove (1) Defendant is a foreign corporation (2) with an agency or representative in the county of suit. Empire Gas and Fuel Co. v. State (Tex.1932) 121 Tex. 138, 47 S.W.2d 265; Southwestern Greyhound Lines v. Day (Eastland CA 1951) 238 S.W.2d 258, no writ. In the case at bar, we hold that Plaintiff-Appellee has met his burden of proof under Subdivision 27 of Article 1995.

Appellant argues that Article 17.56, Texas Business and Commerce Code, which is the special venue statute of the Texas Deceptive Trade Practices Act, is mandatory in deceptive trade practices cases by virtue of Section 30 of Article 1995; that Subdivision 27 of Article 1995 is a permissive venue provision and must yield to the mandatory provisions of Article 17.56; and in order to sustain venue under Article 17.56 as it was worded at the time Plaintiff's suit was filed, the Plaintiff was required to plead and prove a cause of action. Appellant then says that Plaintiff-Appellee Moore

---

**Attorneys and Law Firms**

**\*940** Tom H. Whiteside, Griffis & Griffis, San Angelo, for appellant.

Richard T. Miller, Senterfitt, Adams, Miller & Childress, San Saba, for appellee.

OPINION

JAMES, Justice.

This is a venue case involving Subdivision 27, Article 1995, Vernon's Texas Civil Statutes, pertaining to suits against foreign corporations. Plaintiff-Appellee Bruce Moore brought this suit in McLennan County against Defendant-Appellant Farmland Industries, Inc. (a foreign corporation authorized to do business in Texas) and Defendant San Saba Peanut Growers Cooperative Association, seeking to recover for the loss of 108 feeder hogs which allegedly died as a result of defective feed manufactured by Farmland and sold to Plaintiff Moore by the Coop. Additionally, Moore sought recovery for damages to 78 hogs which did not die but which were allegedly substantially impaired by the feed.

In his original petition, Plaintiff Moore sought treble damages and reasonable attorney's fees under the Texas Deceptive Trade Practices Act, and sued alternatively for actual damages and reasonable attorney's fees for breach of express and implied warranties, and under the theory of strict liability.

Defendant-Appellant Farmland filed a plea of privilege to be sued in Randall County, its asserted residence; whereupon Plaintiff-Appellee Moore controverted under Section 27, Article 1995 and also under Article 17.56 of the Texas Business and Commerce Code, the latter being the special venue statute under the Texas Deceptive Trade Practices Act.

Hearing was had upon venue, at which Plaintiff introduced in evidence his Original Petition, together with Plaintiff's Request for Admissions and Interrogatories and Defendant Farmland's answers in response thereto. As a part of Defendant-Appellant Farmland's said answers, Farmland admitted that (1) it was a foreign corporation not incorporated by the laws of the State of Texas, and (2) that it had an

failed to prove a cause of action, and therefore the trial court erred in overruling the plea of privilege. We do not agree.

Appellant's argument does not take into account that Appellee has not only pleaded a cause of action under the Deceptive Trade Practices Act, but has also pleaded alternatively a cause of action for breach of express and implied warranty, and for strict liability. We therefore do not reach the question of whether Article 17.56, Tex.Bus. and Comm.Code, as it existed at the time pertinent to this case, was mandatory or permissive; because under Plaintiff-Appellee's alternative cause of action for breach of warranty and strict liability, Plaintiff has met his burden of proof for venue purposes under Subdivision 27 of Article 1995. See O. M. Franklin Serum Co. v. C. A. Hoover and Son (Amarillo CA 1966) 410 S.W.2d 272, writ refused, no reversible error, in 418 S.W.2d 482. In other words, Article 17.56 does not come into play here.

Appellant Farmland further argues that Subdivision 27 of Article 1995 cannot be applied against a foreign corporation that has been certified or authorized to do business in the State of Texas, because of the provisions of Article 8.02 of the Business Corporation Act. Article 8.02 in its pertinent parts reads as follows:

"A foreign corporation which shall have received a certificate of authority under this Act shall . . . enjoy the same, but no greater, rights and privileges as a domestic corporation . . . ."

 **[4]**    **[5]**    Appellant argues that this provision essentially makes a foreign corporation "authorized" to do business in Texas, the equivalent of a domestic corporation and that for venue purposes, Subdivision 23, rather than Subdivision 27, would control against an "authorized" foreign corporation, citing **\*942** Burrows v. Texas Kenworth Co. (Tyler CA

1977) 554 S.W.2d 300, writ dismissed. Although Burrows is supportive of Appellant's contention, we do not agree with Burrows, but take the contrary view as expressed by Amoco Production Co. v. Arendale (Houston 14th CA 1979) 581 S.W.2d 755, writ dismissed; Fireman's Fund Insurance Co. v. McDaniel (Beaumont CA 1959) 327 S.W.2d 358, no writ; and Coca Cola Co. v. Allison (1908) 52 Tex.Civ.App. 54, 113 S.W. 308, no writ. Article 8.02, Tex.Bus.Corp. Act, is a general statute relating to foreign corporations, whereas Subdivision 27 of Article 1995 is a specific provision regarding venue in actions brought against foreign corporations. The general rule is that when the law makes a general provision, apparently for all cases, and a specific provision for a particular type case, then the general must yield to the specific. Sam Bassett Lumber Co. v. City of Houston (Tex.1947) 145 Tex. 492, 198 S.W.2d 879. Although as a general rule under Article 8.02, foreign corporations authorized to do business in Texas may have the same rights and privileges as domestic corporations, yet in the special instance of venue, suits against foreign corporations are governed by a different provision, to wit, Subdivision 27 of Article 1995, from domestic corporations, the latter being governed by Subdivision 23 of said Article.

We have carefully considered Appellant's points and contentions, and overrule all of same as being without merit. Judgment of the trial court is accordingly affirmed.

AFFIRMED.

**All Citations**

596 S.W.2d 939

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX D - Laredo Coco-Cola Bottling Co. v. Combs, 317 S.W.3d 735 (Tex. App.—Austin 2010, pet. denied)

317 S.W.3d 735
Court of Appeals of Texas, Austin.

LAREDO COCA–COLA BOTTLING CO.
and Coca–Cola Enterprises, Inc., Appellants,
v.
Susan COMBS, Comptroller of Public Accounts
of the State of Texas; and Greg Abbott, Attorney
General of the State of Texas, Appellees.

No. 03–09–00157–CV
|
April 15, 2010.
|
Rehearing Overruled July 9, 2010.

**Synopsis**
**Background:** Soft drink bottling companies brought action against Comptroller of Public Accounts and Attorney General, challenging denial of refund of sales tax paid on their purchases of soda fountain equipment. The 98th Judicial District Court, Travis County, Rhonda Hurley, J., granted Comptroller's motion for summary judgment and denied companies' motion for summary judgment. Companies appealed.

**Holdings:** The Court of Appeals, G. Alan Waldrop, J., held that:

[1] manufacturing exemption to sales tax did not apply to soft drink companies' purchase of fountain equipment;

[2] contract requirement that customers use only soft drink bottling companies' products in connection with fountain equipment purchased from companies was not consideration, and thus did not trigger sale-for-resale exemption to sales tax;

[3] contract requirement that customers purchase minimum amount of products from soft drink bottling companies as alternative to customers' obligations to make lease or rental payments was not consideration, and thus did not trigger sale-for-resale exemption to sales tax; and

[4] customers' agreement with soft drink bottling companies to assume liability for any damage or loss to equipment sold to them, while in customers' possession, did not constitute

consideration that would demonstrate resale, and thus did not trigger sale-for-resale exemption to sales tax.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (11)

[1]  **Taxation**  Subjects and Exemptions in General

Statutory exemptions from taxation are strictly construed because they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally.

1 Case that cites this headnote

[2]  **Taxation**  Presumptions and burden of proof

The burden of proof for showing that a statutory exemption from taxation applies is on the claimant.

1 Case that cites this headnote

[3]  **Taxation**  Subjects and Exemptions in General

**Taxation**  Presumptions and burden of proof

An exemption from taxation must affirmatively appear in the statutory language, and all doubts are resolved in favor of the taxing authority and against the claimant.

1 Case that cites this headnote

[4]  **Taxation**  Subjects and Exemptions in General

The rule of strict construction cannot be used as an excuse to stray from reasonableness when applying statutory exemptions from taxation.

**[5]** **Administrative Law and Procedure** ⟜ Permissible or reasonable construction

**Administrative Law and Procedure** ⟜ Erroneous or unreasonable construction; conflict with statute

Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute.

**[6]** **Taxation** ⟜ Manufacturing or processing, use or consumption in; incorporation in new product

Manufacturing exemption from sales tax, providing that persons engaged in manufacturing were allowed refund on sales taxes paid on machinery used during manufacturing, did not exempt from taxation soft drink bottling companies' purchase of fountain equipment, where companies purchased fountain equipment and then provided it to businesses who used it to sell soft drinks to customers, and companies did not, themselves, use equipment for manufacturing, processing, fabricating, or repairing tangible personal property. ⚑V.T.C.A., Tax Code § 151.318(g) (Repealed).

**[7]** **Taxation** ⟜ Consideration or profit

**Taxation** ⟜ Retail sales; sales not for resale

"Consideration," which is required for a sale to occur for purposes of the sale-for-resale exemption to the sales tax, can be either a benefit to the promisor or a loss or detriment to the promisee, and surrendering a legal right represents valid consideration. ⚑V.T.C.A., Tax Code § 151.005.

**[8]** **Taxation** ⟜ Consideration or profit

**Taxation** ⟜ Retail sales; sales not for resale

It is not necessary that consideration be pecuniary in order for a sale to occur for purposes of the sale-for-resale exemption to the sales tax.

⚑V.T.C.A., Tax Code § 151.005.

**[9]** **Taxation** ⟜ Consideration or profit

**Taxation** ⟜ Retail sales; sales not for resale

Contractual requirement that customers use only syrup, carbon dioxide, and cups provided by soft drink bottling companies in connection with fountain equipment purchased from companies was not legal detriment to customers or surrender of their legal rights, and thus was not "consideration" sufficient to trigger sale-for-resale exemption to sales tax imposed on companies' purchase of fountain equipment, where contract did not prohibit customers' sales of any products not provided by companies, and requirement only restricted what product could be used in connection with equipment itself. ⚑V.T.C.A., Tax Code §§ 151.005, ⚑151.302(a).

**[10]** **Taxation** ⟜ Consideration or profit

**Taxation** ⟜ Retail sales; sales not for resale

Contract requirement that customers purchase minimum amount of syrup, carbon dioxide, and cups from soft drink bottling companies, as alternative to customers' obligations to make lease or rental payments, was not legal detriment to customers or surrender of their legal rights, and thus was not "consideration" sufficient to trigger sale-for-resale exemption to sales tax imposed on companies' purchase of fountain equipment, where companies admitted that they did not charge any premium on products for customers who received equipment absent any payment obligation, and there was no evidence that customers who failed to purchase required minimum products would be required to pay amount by which actual purchases fell below minimum requirement. ⚑V.T.C.A., Tax Code §§ 151.005, ⚑151.302(a).

**[11]** **Taxation** Consideration or profit

**Taxation** Retail sales; sales not for resale

Customers' agreement with soft drink bottling companies, to assume liability for any damage or loss to companies' equipment, while equipment was in customers' possession, did not constitute "consideration" of type that would demonstrate resale, and thus sale-for-resale exemption to sales tax did not apply to tax imposed on companies' purchase of fountain equipment, regardless whether such assumption of liability might constitute consideration as general matter, where customers' agreement to pay for any damage or loss to equipment resulted in, at most, mere possibility of required payment, and there was no evidence that companies had ever enforced this provision. V.T.C.A., Tax Code §§ 151.006(a)(1), 151.302(a).

**Attorneys and Law Firms**

**\*737** Mark W. Eidman, Curtis J. Osterioh, Ray N. Donley, Scott, Douglass & McConnico, L.L.P., Austin, TX, for Appellants.

Paul H. Masters, Assistant Attorney General, Austin, TX, for Appellees.

Before Chief Justice JONES, Justices PEMBERTON and WALDROP.

**OPINION**

G. ALAN WALDROP, Justice.

This is a suit for a tax refund. Appellants Laredo Coca–Cola Bottling Company and Coca–Cola Enterprises, Inc. purchased soda fountain equipment and then provided the equipment to businesses that used it to sell Coca–Cola drinks to customers. Appellants sued appellees Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas (collectively, the "Comptroller") to recover sales tax paid on appellants' purchases of the equipment. The district court granted the Comptroller's motion for summary judgment and entered a take nothing judgment in favor of the Comptroller on all of appellants' claims. We hold that appellants' purchases are not exempt from sales tax under former tax code section 151.318(g) (the manufacturing exemption), because appellants do not use the equipment for manufacturing, or under tax code section 151.302 (the sale-for-resale exemption), because appellants' provision of the equipment to businesses was not done or performed for consideration as required by the tax code. We affirm the judgment of the district court.

*Factual and Procedural Background*

Appellants are distributors of Coca–Cola branded soft drinks. Appellants purchase concentrate from which they manufacture the finished drink to be placed in bottles or cans and then sold. Appellants also sell to retailers (such as bars and restaurants) the necessary elements for the soft drink to be sold as a fountain product—both the canisters of syrup and carbon dioxide that the fountain equipment mixes with water to produce the soft drink, and the cups, lids, and straws with which an individual drink may be sold. Some of these customers already possess the necessary fountain equipment. For those customers that do not, appellants provide the fountain equipment under one of two types of agreements: (1) a "lease" or "rental" agreement under which the customer makes monthly payments for the use of the equipment; or (2) a "commitment agreement" under which no payments are required, but the customer makes certain commitments.

**\*738** The latter type of agreement—under which appellants provide fountain equipment free of charge—is at issue in this case. Appellants use various form agreements to document this type of agreement with their customers. Generally, the agreements require the customer to purchase a minimum amount of syrup, carbon dioxide, and cups from appellants, and to stock the equipment only with appellants' products, to be distributed only in appellants' cups. Both the equipment and the cups display the Coca–Cola trademark logo. The agreements provide that at all times, each appellant is to remain the "exclusive owner" of the equipment. The customer cannot remove Coca–Cola's branding on the equipment, or move the equipment to a new location without appellants' consent. The customer agrees to assume liability for any damage or loss to the equipment. Appellants provide any necessary repairs, for which the customer agrees to pay, although the customer usually is entitled to a number of free

service calls. Upon entering into an agreement, appellants would deliver and install the equipment at the customer's location. In the event that the customer failed to purchase the minimum amount agreed to, appellants would either commence charging monthly lease or rental payments or repossess the equipment, as authorized under the agreements. Appellants acknowledge that they do not recoup expenses associated with providing the equipment by charging higher prices for the syrup, carbon dioxide, or cups, or charging an amount for any other aspect of the transaction.

The Comptroller denied appellants' refund claim for $750,632 in sales tax paid—attributable to the period from January 1, 1990, through June 30, 1996—on their purchases of fountain equipment from the manufacturer of that equipment. *See* Tex. Tax Code Ann. § 111.104 (West 2008) (refund claims). The Comptroller also denied the motions for rehearing subsequently filed by appellants. *See id.* § 111.105(c), (d) (West 2008) (motions for rehearing).

On February 21, 2003, appellants filed suit in district court against the Comptroller, challenging the denial of their refund claims. *See id.* § 112.151 (West 2008) (suits for refund). Appellants rely on two tax exemptions: (1) the manufacturing exemption, *see generally id.* § 151.318 (West 2008); and (2) the sale-for-resale exemption, *see generally id.* § 151.302 (West 2008). [1] The parties filed competing motions for summary judgment. On March 6, 2009, the district court granted the Comptroller's motion for summary judgment, denied appellants' motion for summary judgment, and entered a take nothing judgment in favor of the Comptroller on all of appellants' claims. Appellants appeal.

### Standard of Review

We review the district court's summary judgment de novo. **\*739** *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156 (Tex.2004). Under the "traditional" standard, a summary judgment should be granted only when the movant establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003). When, as here, both parties file motions for summary judgment and the court grants one and denies the other, we must decide all questions presented and render the judgment that the trial court should

have rendered. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex.2000).

[1] [2] [3] [4] Statutory exemptions from taxation are strictly construed because "they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally." *North Alamo Water Supply Corp. v. Willacy County Appraisal Dist.,* 804 S.W.2d 894, 899 (Tex.1991). Consequently, the burden of proof for showing that the exemption applies is on the claimant. *See id.* The exemption must affirmatively appear in the statutory language, and all doubts are resolved in favor of the taxing authority and against the claimant. *See Bullock v. National Bancshares Corp.,* 584 S.W.2d 268, 272 (Tex.1979). We also recognize that "the rule of strict construction cannot be used as an excuse to stray from reasonableness." *Sharp v. Tyler Pipe Indus., Inc.,* 919 S.W.2d 157, 161 (Tex.App.-Austin 1996, writ denied).

### Manufacturing Exemption

Appellants assert that some of their purchases of the fountain equipment are exempt from sales tax under the manufacturing exemption. During the audit period, section 151.318(g) of the tax code provided as follows:

> Each person engaged in manufacturing, processing, fabricating, or repairing tangible personal property for ultimate sale is entitled to a refund or a reduction in the amount of tax imposed by this chapter as provided by Subsection (h) for the purchase of machinery, equipment, and replacement parts or accessories with a useful life in excess of six months if the equipment is used or consumed in or during the actual manufacturing, processing, fabrication, or repair of tangible personal property for ultimate sale, and the use or consumption of the property is necessary or essential to the manufacturing, processing,

fabrication, or repair operation, or to a pollution control process.

Act of May 8, 1989, 71st Leg., R.S., ch. 154, § 1, 1989 Tex. Gen. Laws 532, 533, *repealed by* Act of May 31, 1999, 76th Leg., R.S., ch. 1467, § 4.01(3), 1999 Tex. Gen. Laws 4996, 5036. Appellants contend that this exemption applies to the fountain equipment because (1) the fountain equipment is "used ... in or during the actual manufacturing" of fountain drinks by appellants' customers for ultimate sale, and (2) appellants are independently "engaged in manufacturing" by virtue of their bottling and canning activities.

The Comptroller contends that the manufacturing exemption does not apply to appellants' purchase of the fountain equipment because appellants do not, themselves, use the equipment for manufacturing. The Comptroller has consistently maintained this interpretation. *See* Tex. Comptroller of Pub. Accounts, Hearing No. 29,774 (Oct. 12, 1994) ("The refund is available only to persons engaged in manufacturing with respect to equipment used by that person in actual manufacturing."); *see also* Tex. Comptroller of Pub. Accounts, Hearing No. 39,695 (Dec. 30, 2002) (issue has been "conclusively decided"); **\*740** Tex. Comptroller of Pub. Accounts, Hearing No. 31,922 (Dec. 19, 1996) (follows Hearing No. 29,774).

 **[5]**    "Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute." *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993). It is a reasonable construction of former section 151.318(g) that its tax exemption for items used in manufacturing applies only to the entity that, in fact, uses those items for manufacturing. Under appellants' interpretation, they would get the tax benefits of a customer's activities based on the happenstance of unrelated manufacturing activities that have nothing to do with the equipment at issue. Such a result runs contrary to the requirement that exemptions from taxation be strictly construed. *See North Alamo Water Supply Corp.,* 804 S.W.2d at 899. It is a reasonable interpretation of the manufacturing exemption, then, that it applies to purchases by the entity that actually uses the purchased equipment for manufacturing.

 **[6]**    We hold that former section 151.318(g) of the tax code (the manufacturing exemption) does not exempt from taxation appellants' purchases of the fountain equipment at issue because the equipment is not used by appellants in manufacturing, processing, fabricating, or repairing tangible personal property.

### *Sale–for–Resale Exemption*
Appellants also assert that some of their purchases of the fountain equipment are exempt from sales tax under the sale-for-resale exemption. A "sale for resale of a taxable item" is exempt from sales tax. *See* Tex. Tax Code Ann. § 151.302(a). Appellants rely on the following statutory definition of "sale for resale":

> "Sale for resale" means a sale of ... tangible personal property ... to a purchaser who acquires the property ... for the purpose of reselling it in the United States of America ... in the normal course of business in the form or condition in which it is acquired or as an attachment to or integral part of other tangible personal property....

*Id.* § 151.006(a)(1) (West 2008).

The Comptroller contends that appellants' provision of the relevant fountain equipment to their customers does not qualify as a "sale" and, therefore, appellants' acquisition of the equipment is not "for the purpose of reselling it." To be a "sale" for purposes of the sale-for-resale exemption, the resale must—among other requirements—be "done or performed for consideration." *See id.* § 151.005 (West 2008). Therefore, if appellants' transferring of fountain equipment to their customers was done for no consideration, the sale-for-resale exemption does not apply to appellants' purchase of that equipment. [2]

 **[7]**    **[8]**    Consideration can be either a benefit to the promisor or a loss or detriment to the promisee, and surrendering a **\*741** legal right represents valid consideration. *Northern Natural Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 607 (Tex.1998). Moreover, it is not necessary that consideration

be pecuniary. *See* *Angelou v. African Overseas Union,* 33 S.W.3d 269, 280 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Appellants rely on three characteristics of their agreements with their customers to argue that the transfer of the equipment is done or performed for consideration.

 [9]    First, appellants refer to the requirement that the customer use only the products purchased from appellants—syrup, carbon dioxide, and cups—in connection with the fountain equipment. However, we decline to consider this requirement to be a legal detriment to the customer or a surrender of a legal right because the agreements do not, in fact, prohibit the customer's sale of any products not provided by appellants. The requirement only restricts what product can be used in connection with the equipment itself.

 [10]    Next, appellants point to the requirement that the customer purchase a minimum amount of syrup, carbon dioxide, and cups from appellants. This requirement exists, under the applicable agreements, as the alternative to the customer's obligation to make lease or rental payments. Appellants admit, however, that they did not charge any premium on those products for customers who receive the equipment absent any payment obligation. *See Bullock v. Cordovan Corp.,* 697 S.W.2d 432, 435–36 (Tex.App.-Austin 1985, writ ref'd n.r.e.) (finding consideration for freely distributed magazines due to advertisers' payment to claimant of "additional amount to have the magazines distributed to a certain group"); Tex. Comptroller of Pub. Accounts, Hearing No. 30,151 (Dec. 30, 1993) (finding consideration for free transfer of ovens because transferor received discount on services provided by transferee when using transferred ovens). During the time period in which the customer satisfies the minimum requirement, the only amounts paid to appellants are the amounts paid for the syrup, carbon dioxide, and cups sold, which amounts would be the same for a customer who paid for the equipment under a lease or rental agreement and made the exact same product sales. In the event the customer does not meet its required minimum purchase for the applicable time period, appellants acknowledge that their only response is either to repossess the equipment or to commence assessing lease or rental payments on a prospective basis. Thus, there is no evidence that a customer who fails to purchase the required minimum will be required to pay the amount by which the actual purchases fell below the minimum requirement. To the extent the minimum requirement in this case is actually a detriment to the customer, then, such a detriment relates only to the fountain products themselves, not the equipment. [3]

 [11]    The other contractual provision on which appellants rely is the customer's agreement to assume liability for any damage or loss to the equipment while in the customer's possession. Regardless whether such an assumption of liability might constitute consideration as a general matter, we decline to hold that, in these circumstances, **\*742** it constitutes consideration of a type such as would demonstrate a "resale" under tax code section 151.006(a)(1). The agreement by appellants' customer to pay for any damage or loss to the equipment in its possession results in, at most, the mere possibility of a required payment. Moreover, there is no evidence in the record that appellants have ever enforced this contractual provision. [4] Therefore, there is no evidence that such contractual requirement is, in fact, a detriment to the customer such that appellants' provision of the equipment to their customers—and not appellants' original purchase from the manufacturer—is the transaction that should be subject to sales tax. *See* *National Bancshares Corp.,* 584 S.W.2d at 272 (for tax exemptions, all doubts resolved in favor of taxing authority and against claimant); *DuPont Photomasks, Inc. v. Strayhorn,* 219 S.W.3d 414, 419 (Tex.App.-Austin 2006, pet. denied) ("The purpose of the sale-for-resale exemption is to prevent double taxation."); *cf. G & J Pepsi Cola Bottling, Inc. v. Limbach,* 48 Ohio St.3d 31, 548 N.E.2d 936, 939 (1990) (finding assumption of liability for damage or loss to equipment to be consideration, under Ohio law, where record demonstrated retailers were charged for "damages to equipment caused by a car being driven into a machine and for damages to equipment caused by fire").

We hold that the transactions at issue—involving appellants' providing fountain equipment to customers free of charge as long as those customers otherwise meet minimum purchase requirements of sort drink products—is not a "sale" as contemplated by the "sale-for-resale" exemption of the tax code. Therefore, section 151.302(a) of the tax code (the sale-for-resale exemption) does not exempt from taxation appellants' purchases of the equipment.

### Conclusion

Based on the summary judgment record, appellants' purchases of fountain equipment are not exempt from sales tax under former tax code section 151.318(g) (the manufacturing exemption) or tax code section 151.302 (the sale-for-resale exemption). We affirm the judgment of the district court.

**All Citations**

317 S.W.3d 735

---

## Footnotes

1    Appellant Laredo Coca–Cola Bottling Company seeks a refund of $29,321 plus interest for the audit period May 1, 1993, through June 30, 1996, and relies exclusively on the manufacturing exemption. Appellant Coca–Cola Enterprises, Inc. is the successor in interest to Coca–Cola Bottling Company of Texarkana and Austin Coca–Cola Bottling Company. Coca–Cola Bottling Company of Texarkana sought a refund of $6,725 plus interest for the audit period October 1, 1991, through June 30, 1996, and relied exclusively on the manufacturing exemption. Austin Coca–Cola Bottling Company sought a refund of $193,770 plus interest for the audit period January 1, 1990, through December 31, 1992, based solely on the sale-for-resale exemption, and sought a refund of $520,816 plus interest for the audit period July 1, 1991, through June 30, 1996, based on both the manufacturing exemption and the sale-for-resale exemption.

2    Appellants contend that the party asserting lack of consideration has the burden of proof. However, the cases appellants cite involve a dispute between the parties to the alleged contract with regard to the validity of the contract in general, not a party to the contract seeking a tax exemption relating to a component of the contract. *See* *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.,* 115 S.W.3d 287, 293 (Tex.App.-Corpus Christi 2003, pet. denied); *Rodriguez v. Southwestern Drug Corp.,* 619 S.W.2d 469, 472 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ). The burden of proof in a typical contract case does not alter the burden of proof where a claimant is seeking to come within an exemption to taxation.

3    Appellants cite *Northern Natural Gas Co. v. Conoco, Inc.,* in which the supreme court held that the defendant's "promise to deliver for processing all gas that [the defendant] receives under the gas purchase contracts is the surrender of a legal right and therefore is sufficient consideration." 986 S.W.2d 603, 607 (Tex.1998). However, in this case, the issue is not whether appellants' agreements, as a general matter, are supported by consideration. The issue is whether the transfer of the equipment itself is supported by consideration. *Northern Natural Gas Co.* does not alter our conclusion that it is not.

4    In some cases, the applicable agreement required the customer to obtain insurance against damage or loss to the fountain equipment. However, Steven McMahan, appellants' designated corporate representative, admitted in his deposition that appellants did not obtain verification of insurance. Moreover, appellants provided no evidence regarding whether such a provision required the customer to purchase insurance in addition to its preexisting coverage.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX E - Sw. Royalties, Inc. v. Hegar, 500 S.W.3d 400 (Tex. 2016)

500 S.W.3d 400
Supreme Court of Texas.

SOUTHWEST ROYALTIES, INC., Petitioner,

v.

Glenn HEGAR, Comptroller of Public Accounts
of the State of Texas, and Ken Paxton, Attorney
General of the State of Texas, Respondents

NO. 14–0743
|
Argued March 8, 2016
|
OPINION DELIVERED: June 17, 2016
|
Rehearing Denied October 21, 2016

**Synopsis**
**Background:** Oil and gas company brought action against Comptroller and Attorney General, challenging Comptroller's determination that it was not entitled to tax exemption for sales tax paid on purchase of equipment, materials, and associated services under tax code provision governing property used in manufacturing. Following a bench trial, the trial court rendered judgment for defendants. Company appealed. The Austin Court of Appeals affirmed. Company petitioned for review.

**Holdings:** The Supreme Court, Johnson, J., held that:

[1] term "processing," as used in tax code provision governing exemption for sales tax paid on property used in manufacturing of tangible personal property was not ambiguous, and

[2] equipment in question was not used by company in the actual physical application of materials and labor to hydrocarbons that was necessary to cause, and caused, a physical change to hydrocarbons and, thus was not used in processing of oil and gas, so as to entitle company to tax exemption.

Affirmed.

**Procedural Posture(s):** On Appeal.

**West Headnotes (11)**

**[1]    Appeal and Error**  ◆ Statutory or legislative law

Statutory construction is a question of law that the appellate court reviews de novo.

13 Cases that cite this headnote

**[2]    Statutes**  ◆ Language and intent, will, purpose, or policy

**Statutes**  ◆ Plain Language; Plain, Ordinary, or Common Meaning

The court's primary objective, when engaging in statutory construction, is to give effect to the Legislature's intent, which the court ascertains from the plain meaning of the words used in the statute, if possible.

26 Cases that cite this headnote

**[3]    Taxation**  ◆ Subjects and Exemptions in General

Tax exemptions are narrowly construed and the taxpayer has the burden to clearly show that an exemption applies. ⚐Tex. Tax Code Ann. § 151.318(r).

13 Cases that cite this headnote

**[4]    Taxation**  ◆ Subjects and Exemptions in General

Although statutory tax exemptions are narrowly construed, construing them narrowly does not mean disregarding the words used by the Legislature.

8 Cases that cite this headnote

**[5]    Statutes**  ◆ What constitutes ambiguity; how determined

**Statutes**  ◆ Questions of law or fact

Whether statutory language is ambiguous is a matter of law for courts to decide, and language

is ambiguous only if the words yield more than one reasonable interpretation.

23 Cases that cite this headnote

**[6]** **Statutes** 🗝 Undefined terms

**Statutes** 🗝 Construing together; harmony

When a statute contains a term that is undefined, the term is typically given its ordinary meaning, but the meaning must be in harmony and consistent with other statutory terms, and if a different, more limited, or precise definition is apparent from the term's use in the context of the statute, the court applies that meaning.

24 Cases that cite this headnote

**[7]** **Statutes** 🗝 What constitutes ambiguity; how determined

**Statutes** 🗝 Undefined terms

**Statutes** 🗝 Context

If an undefined term in a statute has multiple common meanings, it is not necessarily ambiguous; rather, the court will apply the definition most consistent with the context of the statutory scheme.

19 Cases that cite this headnote

**[8]** **Taxation** 🗝 Manufacturing or processing, use or consumption in; incorporation in new product

Term "processing," as used in tax code provision governing exemption for sales tax paid on property used in manufacturing of tangible personal property was not subject to more than one reasonable interpretation and, thus, was not ambiguous; legislature intended such term to mean the physical application of the materials and labor necessary to modify or change characteristics of tangible personal property. ⚑Tex. Tax Code Ann. § 151.318(a)(2), (5), (10); ⚑34 Tex. Admin. Code § 3.300(a)(10).

5 Cases that cite this headnote

**[9]** **Taxation** 🗝 Administrative agencies and regulation

Although the Comptroller's definition of a term in a tax statute is not binding, the court may consider it in determining the definition most consistent with the scheme of the statute, just as it may look to other aids for construing statutory language.

5 Cases that cite this headnote

**[10]** **Statutes** 🗝 What constitutes ambiguity; how determined

The inquiry, when evaluating whether a statute is ambiguous, is not whether the scope of a statute is ambiguous, but rather whether the statutory language itself is ambiguous.

18 Cases that cite this headnote

**[11]** **Taxation** 🗝 Manufacturing or processing, use or consumption in; incorporation in new product

Equipment such as casing, tubing, and pumps was not used by oil and gas company in the actual physical application of materials and labor to hydrocarbons that was necessary to cause, and caused, a physical change to hydrocarbons and, thus was not used in processing of oil and gas, so as to entitle company to tax exemption for sales tax paid on purchases of such equipment; while equipment was both used in and necessary to efficient recovery of hydrocarbons from reservoirs, the changes in the substances were caused not by application of equipment and materials to them, but by natural pressure and temperature changes that occurred as hydrocarbons traveled from reservoir through casing and tubing to surface. ⚑Tex. Tax Code Ann. § 151.318(a)(2), (5), (10); ⚑34 Tex. Admin. Code § 3.300(a)(10).

**\*401** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS, [David E. Puryear](), J.

**Attorneys and Law Firms**

[Bryan A. Garner](), Karolyne H.C. Garner, LawProse, Inc., Dallas TX, [David E. Keltner](), Kelly Hart & Hallman LLP, Fort Worth TX, Doug Sigel, [Mark W. Eidman](), [Quentin Doug Sigel](), Ryan Law Firm LLP, [Ray H. Langenberg](), Scott Douglass & McConnico, LLP, Austin TX, for Petitioner.

Charles E. Roy, First Assistant Attorney General, Office of the Attorney General, [Michael P. Murphy](), [Scott A. Keller](), Asst. Solicitor General, [Warren Kenneth Paxton Jr.](), Attorney General of Texas, Austin TX, for Respondents.

[Everard A. Marseglia](), [Jillian Marullo](), Liskow & Lewis, PLC, Houston TX, [Christopher Pepper](), Lloyd Gosselink Rochelle & Townsend PC, [Amanda Martin](), Texas Association of Business, [Chesley N. Blevins](), Jackson Walker LLP, Lisa Erin Hobbs, Kuhn Hobbs PLLC, [Robert Earl Henneke](), Texas Public Policy Foundation, **\*402** Allegra Hill, Austin TX, for Amicus Curiae.

**Opinion**

JUSTICE [JOHNSON]() delivered the opinion of the Court.

The question in this tax-refund case is whether an oil and gas exploration and production company proved that its purchases of casing, tubing, other well equipment, and associated services were exempt from sales taxes under a statutory exemption. The trial court found that the company did not prove it was entitled to the exemption. The court of appeals affirmed. We likewise affirm.

## I. Background

Southwest Royalties, Inc. is an oil and gas exploration and production company. It purchased and paid sales taxes on equipment, materials, and associated services related to its oil and gas production operations for the period from January 1, 1997, to April 30, 2001. In 2009, Southwest filed a tax refund claim with the Comptroller, [1] asserting it was entitled to an exemption from the tax for some of the equipment such as casing, tubing, and pumps (collectively, equipment), together with associated services. *See* [TEX. TAX CODE § 111.104]()

(providing for filing a tax refund claim with the comptroller). It based its claim on the following Tax Code provisions:

**Property Used in Manufacturing**

(a) The following items are exempted from the taxes imposed by this chapter if sold, leased, or rented to, or stored, used, or consumed by a manufacturer:

...

(2) tangible personal property directly used or consumed in or during the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary or essential to the manufacturing, processing, or fabrication operation and directly makes or causes a chemical or physical change to:

(A) the product being manufactured, processed, or fabricated for ultimate sale; or

(B) any intermediate or preliminary product that will become an ingredient or component part of the product being manufactured, processed, or fabricated for ultimate sale;

...

(5) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to a pollution control process;

...

(10) tangible personal property used or consumed in the actual manufacturing, processing, or fabrication of tangible personal property for ultimate sale if the use or consumption of the property is necessary and essential to comply with federal, state, or local laws or rules that establish requirements related to public health.

Id. § 151.318.

Southwest sought the refund on the basis that the equipment was used in or during the process of extracting oil, gas, and associated substances (collectively, hydrocarbons), from underground mineral reservoirs, separating the hydrocarbons into their component substances, and bringing them to the surface. The Comptroller denied relief, noting a previous

determination **\*403** that the type of equipment in question was used for transportation, not manufacturing. Comptroller Hearing 100,619 (2009). After its motion for rehearing was denied, Southwest sued the Comptroller and the Attorney General (collectively, the State). *See* TEX. TAX CODE § 112.151.

In its suit, Southwest asserted that hydrocarbons extracted from an underground reservoir must be separated into their component parts to produce saleable products, and the equipment for which it sought refunds was used in "processing" the hydrocarbons as they were extracted from the reservoir and brought to the surface, that is, it was used in separating the hydrocarbons into their different components. The State countered that Southwest was not entitled to the exemption because oil and gas exploration companies are not manufacturers and because extracting minerals and bringing them to the surface is not manufacturing.

Following a bench trial, the trial court found that physical changes occur in hydrocarbons when they are extracted from their underground reservoir and lifted to the surface. But it also found that Southwest's equipment was not the direct cause of the changes; rather, the changes were directly caused by temperature and pressure changes as the hydrocarbons moved upward toward the surface. The court concluded that Southwest failed to meet its burden to prove the exemption applied, and rendered judgment for the State.[2] Southwest does not challenge any of the trial court's findings of fact.

Southwest appealed. The appeals court determined that the statute is ambiguous **\*404** regarding "what qualifies as property or services used during 'actual manufacturing, processing, or fabrication' " under the Tax Code. 501 S.W.3d 95 (Tex.App.–Austin 2014). Deferring to the agency's interpretation of the statute because of this ambiguity, the court held that the Comptroller's interpretation—that the Legislature did not intend the manufacturing exemption to apply to the extraction of oil and gas—was not plainly erroneous or inconsistent with the statutory language. *Id.* It affirmed.

In this Court, Southwest asserts that (1) hydrocarbons are tangible personal property once they are severed from the reservoir and pass into the casing in the wellbore, and (2) it proved its equipment was used for "processing" because it was used in separating the hydrocarbons into their component parts.[3] Southwest also claims that despite the court of

appeals' determination, the statute is unambiguous and this Court should not defer to the Comptroller's interpretation. Finally, Southwest asserts that the exemption applies because the equipment is used in processing and is essential for controlling pollution, *see* TEX. TAX CODE § 151.318(a)(5), and for compliance with public-health laws. *See* *id.* § 151.318(a)(10).

The State counters that (1) the manufacturing exemption must be construed narrowly with any doubts resolved against Southwest; (2) construing the exemption narrowly yields the conclusion that mineral extraction is not "manufacturing," "processing," or "fabrication"; and (3) construing the statute otherwise is inconsistent with other provisions of the Tax Code. Further, the State asserts that even if extraction is processing, the changes the hydrocarbons undergo during their movement to the surface are directly caused by natural pressure and temperature changes, not Southwest's equipment. The State also argues that the exemption is inapplicable because minerals below the surface are real property, not "tangible personal property," under the Tax Code, even if they have been severed from the reservoir and are inside well casing and tubing.

## II. Discussion

### A. Standard of Review

**[1]** **[2]** **[3]** **[4]** Statutory construction is a question of law that we review *de novo*. *First Am. Title Ins. Co. v. Combs,* 258 S.W.3d 627, 631 (Tex.2008). Our primary objective is to give effect to the Legislature's intent, which we ascertain from the plain meaning of the words used in the statute, if possible. *Greater Hous. P'ship v. Paxton,* 468 S.W.3d 51, 58 (Tex.2015). Tax exemptions are narrowly construed and the taxpayer has the burden to "clearly show" that an exemption applies. *See* TEX. TAX CODE § 151.318(r); *Bullock v. Nat'l Bancshares Corp.,* 584 S.W.2d 268, 271–72 (Tex.1979). Although statutory tax exemptions are narrowly construed, construing them narrowly does not mean disregarding the words used by the Legislature. *See* *AHF–Arbors at Huntsville I, LLC v. Walker Cty. Appraisal Dist.,* 410 S.W.3d 831, 837 (Tex.2012).

The State asserts that we should afford deference to the Comptroller's interpretation of the manufacturing exemption because "the construction is reasonable and does not contradict the plain language of the statute." *First Am. Title Ins. Co.,* 258 S.W.3d at 632. In that vein, we have long **\*405** recognized that an agency's construction of a statute may be taken into consideration by courts when interpreting statutes, but *deferring* to an agency's construction is appropriate only when the statutory language is ambiguous. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 625 (Tex.2001). In *Texas Citizens for a Safe Future* we explained that judicial deference to an agency's construction of a statute is tempered by several considerations, including that "the language at issue must be ambiguous." *Id.* (quoting *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 747–48 (Tex.2006)); *see Tracfone Wireless, Inc. v. Comm'n on State Emergency Commc'ns,* 397 S.W.3d 173, 182 (Tex.2013) ("[C]ourts sometimes defer to agencies' statutory interpretations, but only when a statute is ambiguous.... Agency deference has no place when statutes are unambiguous—the law means what it says—meaning we will not credit a contrary agency interpretation that departs from the clear meaning of the statutory language."). With the foregoing in mind, we turn to the language of the statute.

### B. Is the Statute Ambiguous?

 **[5]** The statute provides that the sales tax exemption applies to tangible personal property used in "the actual manufacturing, processing, or fabrication of tangible personal property." TEX. TAX CODE § 151.318(a)(2), (5), (10). The main disagreement between the parties is whether the equipment is used for "processing," and neither argues that the term is ambiguous. However, the fact that the parties do not contend a statute is ambiguous does not mean that it is not. Whether statutory language is ambiguous is a matter of law for courts to decide, and language is ambiguous only if the words yield more than one reasonable interpretation. *See Combs v. Roark Amusement & Vending, L.P.,* 422 S.W.3d 632, 635 (Tex.2013); *Tex. Citizens for a Safe Future,* 336 S.W.3d at 628 ("It is precisely when a statutory term is *subject to multiple understandings* that we should defer to an agency's reasonable interpretation." (emphasis added)).

 **[6]**   **[7]** When a statute contains a term that is undefined, as "processing" is in this case, the term is typically given its ordinary meaning. *State v. $1,760.00 in U.S. Currency,* 406 S.W.3d 177, 180 (Tex.2013). But the meaning must be in harmony and consistent with other statutory terms and "[i]f a different, more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *Id.* If an undefined term has multiple common meanings, it is not necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme. *See Thompson v. Tex. Dep't Licensing & Regulation,* 455 S.W.3d 569, 571 (Tex.2014).

 **[8]**   **[9]** Here the three words "manufacturing," "processing," and "fabrication" are found in a section entitled "Property Used in Manufacturing." TEX. TAX CODE § 151.318. Southwest recognizes that "processing" may sometimes be encompassed within "manufacturing," as the State asserts, but argues that "processing" as used in the statute must refer to something different from "manufacturing" and "fabrication," otherwise it is surplusage. Citing various dictionary definitions, Southwest argues that "processing" as used in the statute involves "creating or inducing a physical change" in the tangible personal property being processed, and "processing" of hydrocarbons need not be "manufacturing" to come within the exemption provided by section 151.318. We agree with Southwest. While manufacturing may well include types of "processing," the use of the separate term "processing" **\*406** in the statute indicates the Legislature understood and intended that "processing" includes matters outside the confines of "manufacturing." In this regard, the Comptroller has defined "processing" as it is used in section 151.318 as being "[t]he physical application of the materials and labor necessary to modify or change the characteristics of tangible personal property." 34 TEX. ADMIN. CODE § 3.300(a)(10). The State asserts that even if "processing" is not encompassed within "manufacturing," this definition applies. Although the Comptroller's definition is not binding, we may consider it in determining the definition most consistent with the scheme of the statute, just as we may look to other aids for construing statutory language. *See $1,760.00 in U.S. Currency,* 406 S.W.3d at 181; *Firestone Tire & Rubber Co. v. Bullock,* 573 S.W.2d 498, 500 n.3 (noting that the Comptroller's definition will not be effective to expand or contract the language of the statute).

The definitions cited by, and the interpretation proposed by, Southwest, as well as the Comptroller's definition, are consistent with the other text of the statute. Even though there may be shades of difference in various definitions of "processing," we think the differences are immaterial when the term is considered in context of the framework of ⚑section 151.318. *See Thompson,* 455 S.W.3d at 571. The essence of all the common meanings of "processing" correlate with the definition adopted by the Comptroller.

 **[10]** The State asserts that there may be an ambiguity about "the scope" of the exemption. But the inquiry is not whether the scope of a statute is ambiguous, but rather whether the statutory language itself is ambiguous. ⚑*Tex. Dep't of Ins. v. Am. Nat'l Ins. Co.,* 410 S.W.3d 843, 853–54 (Tex.2011) ("An administrative agency's construction of a statute it implements ordinarily warrants deference when ... *the statutory language at issue* is ambiguous.") (emphasis added); *see Thompson,* 455 S.W.3d at 572 (considering the statutory phrase "evidence of the person's rehabilitation or rehabilitative effort while incarcerated or after release" to determine whether the language was ambiguous before considering whether it included the requirements urged by the Department of Licensing and Regulation).

Because, in context, the statutory language is not subject to multiple understandings, we agree with the parties that it is not ambiguous. The Legislature intended "processing" in subsections 151.318(a)(2), (5), and (10) to mean the application of materials and labor necessary to modify or change characteristics of tangible personal property.

### C. Is the Equipment Used in Processing?

 **[11]** The three Tax Code subsections under which Southwest sought an exemption require that the property at issue be used in actual "processing"—application of materials and labor necessary to modify or change the characteristics of tangible personal property. *See* ⚑TEX. TAX CODE § 151.318(a)(2), (5), (10); ⚑34 TEX. ADMIN. CODE § 3.300(a)(10). As noted previously, it is undisputed that hydrocarbons undergo physical changes as they move from underground reservoirs to the surface; the disagreement is about the role Southwest's equipment plays in those changes.

Hydrocarbons generally reside within porous formations or reservoirs of rock under great pressure from the overlaying earth. 2 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[B][1], at 8–22.5. Usually, when a well penetrates and is completed in the reservoir, the differential between the pressure inside the wellbore and the pressure on **\*407** hydrocarbons in the formation causes the hydrocarbons to flow out of the formation and into the well. *Id.* But many times, for various reasons, hydrocarbons will not move from their reservoir into the well bore absent application of artificial means to cause them to exit the formation. The casing for which Southwest sought the exemption is a steel pipe that is inserted into a borehole that keeps the borehole from collapsing. Portions of the casing are cemented into place. The tubing for which Southwest also sought an exemption is a smaller tube that hangs inside the casing. Most of the hydrocarbon fluids rise to the surface through the tubing while gas separated from the fluids generally moves into and up the space between the tubing and the casing. As the hydrocarbons move into and up the casing and tubing, the changing pressure and temperature result in their separating into gas and liquids.

Southwest argues that the casing and tubing system both begins and continues the "processing" of hydrocarbons into separate substances of oil, gas, and condensates. But the trial court found that the direct causes of the changes in the hydrocarbons were pressure and temperature changes, while the equipment was only an indirect cause of them. And the evidence supporting those findings is not challenged by Southwest. For example, Robert Newton, the Permian Basin division manager for Clayton Williams Energy (the owner of Southwest Royalties) testified that the wells begin the process of separating the hydrocarbons into gas and liquid by creating a pressure drawdown and bringing the hydrocarbons into the wellbore, which then separates them. He later explained, however, that the casing maintains, but does not cause, pressure, and if hydrocarbons enter an uncased borehole and move toward the surface, they exhibit the same physical changes. Terry Payne, a petroleum engineer, testified for Southwest that the wells were the cause of the change to the hydrocarbons because without them the hydrocarbons would stay in the ground. But he also testified that the phase changes the hydrocarbons undergo result from changes in pressure and temperature. Thomas Richter, a petroleum engineer, testified for the State that the phase changes were a natural, physical process that occurs from the reservoir to the top of a well and whether casing was in the well was only incidental to the changes. He explained that the casing and tubing were

essentially only conduits through which the hydrocarbons exit the reservoir and proceed to the surface. No evidence identified any way Southwest's equipment acted upon the hydrocarbons to cause a modification or change in them other than by being the vehicle which caused them to exit, and through which they exited, the underground formation and traveled to the surface.

While the parties and *amici* argue extensively over whether oil and gas production generally is processing, our inquiry is more narrow; it is whether the equipment for which Southwest is seeking an exemption was used in the actual physical application of materials and labor to the hydrocarbons that was necessary to cause, and caused, a physical change to them. "Used" and "actual" are not defined in the statute so we look to their common, ordinary meanings. *$1,760.00 in U.S. Currency,* 406 S.W.3d at 180. "Used" is defined as "employed in accomplishing something," and "actual" is defined as "existing in act and not merely potentially." MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY 12, 1297 (10th ed.2000). While the equipment unquestionably was both used in and necessary to the efficient recovery of hydrocarbons from their reservoirs, there is no evidence that the equipment acted upon the hydrocarbons to modify or change **\*408** their characteristics. The changes in the substances were caused not by the application of equipment and materials to them, but by the natural pressure and temperature changes that occurred as the hydrocarbons traveled from the reservoir into and through the casing and tubing to the surface.

Both parties rely on lower court decisions interpreting terms in Tax Code section 151.318. Those cases are consistent with our conclusion. In *Rylander v. Haber Fabrics Corp.,* Haber Fabrics challenged the Comptroller's decision that Haber did not "process" second quality fabric by sorting, airing, inspecting, cutting, and packaging it to be first quality grade. 13 S.W.3d 845, 848 (Tex.App.–Austin 2000, no pet.). The trial court agreed with Haber, and the court of appeals affirmed. *Id.* at 847. The court of appeals held that Haber's activities satisfied the Comptroller's definition of processing because Haber "applies materials and labor to modify or change the characteristics of the fabric." *Id.* Here, in contrast, while Southwest applied the equipment to move substances from underground reservoirs to the surface, it did not apply the equipment to modify or change their characteristics. Rather, as the trial court found, inherent

characteristics of the hydrocarbons and natural forces of changing pressures and temperatures caused the changes.

In *Sabine Mining Co. v. Strayhorn,* the court considered whether "dragline" machines were property used in manufacturing and, therefore, exempt from sales tax. 2007 WL 2390686 (Tex.App.–Corpus Christi 2007, no pet.) (mem.op.). The company seeking the exemption, Sabine Mining, used the draglines to remove overburden—a layer of dirt and rock—from atop underground coal deposits. *Id.* at \*1. The removal of the overburden reduced weight and pressure on the coal and exposed it to oxygen which caused fracturing. *Id.* These changes altered the physical appearance of the coal and also increased its energy content. *Id.* The court concluded that the changes to the coal were not a "direct" result of the draglines. *Id.* at \*3. The court explained that a reasonable interpretation of "direct" implies a close link with no intervening causes, and the dragline was merely an "indirect" cause of the changes. *Id.* at \*4. This is similar to the situation here where natural pressure and temperature changes are, as the trial court found, the direct causes of the changes to the hydrocarbons and the equipment was an indirect cause.

Southwest also asserts that in two other matters the Comptroller has granted exemptions for equipment used in oil and gas extraction and mineral operations. But in neither of those matters did the Comptroller conclude that bringing oil and gas to the surface, without additional affirmative action using property to effect changes in their characteristics, was "processing." *See* Comptroller Hearing 31,253 (1998) ("It has long been the position of the Agency that the act of bringing oil to the surface of the earth is not processing.... [W]e have concluded that injecting carbon dioxide for the purpose of thinning or increasing the gravity of the oil creates a physical change in the oil and is, therefore, a processing activity."); Comptroller Letter Ruling 200903457L (2009)Letter Ruling 200903457L (2009) ("Although the act of producing oil or gas (bringing oil or gas to the surface of the earth) is not processing[,] the use of liquid carbon dioxide (CO2) to thin or increase the gravity of crude oil causes a physical change in the oil and thus constitutes processing for sales and use tax purposes.").

Southwest also cites Comptroller decisions that determined processing occurred below ground, but these decisions are inapposite. Our decision does not turn on the fact that the alleged processing occurred underground as opposed to above ground. **\*409** Rather, it turns on the fact that the trial court did not find, and there is no evidence that, the equipment

was applied to cause changes in their characteristics as the hydrocarbons moved from the reservoir to the surface. *See* Comptroller Hearing 31,842 (2004) (finding that pumping superheated water into sulphur formations caused a physical or chemical change in the sulphur); Comptroller Letter Ruling 9506L1351F01 (1995) (finding that equipment used to break apart the ground and shatter the underlying limestone and shale into pieces to be processed into cement qualified as manufacturing equipment); Comptroller Hearing 27,940 (1992) (concluding that explosives used to blast rock and sandstone formations were used in processing gravel and sand); Comptroller Hearing 23,055 (1988) (determining that dynamite used to blast rock out of the earth and start reducing the size of large boulders to gravel was exempt). And regardless of the Comptroller's prior interpretations, the question here is one of statutory construction which "ultimately is one left to the courts." *Roark Amusement & Vending,* 422 S.W.3d at 638.

### III. Conclusion

Southwest did not prove that the equipment for which it sought a tax exemption was used in "actual manufacturing, processing, or fabricating" of hydrocarbons within the meaning of Tax Code section 151.318(2), (5), or (10). Thus, Southwest is not entitled to an exemption from paying sales taxes on purchases of the equipment. Our conclusion makes it unnecessary to address any other issues the parties present.

We affirm the judgment of the court of appeals.

### All Citations

500 S.W.3d 400, 59 Tex. Sup. Ct. J. 1316

---

### Footnotes

1    Susan Combs was comptroller at the time suit was filed. Glenn Hegar succeeded her and has been substituted as comptroller. *See* TEX. R. APP. P. 7.2(a).

2    Salient findings of fact and conclusions of law made by the trial court are set out below:

**I. FINDINGS OF FACT**

6. The term "petroleum" as used by this Court includes not only crude oil, but all liquid and gaseous hydrocarbon constituents in an oil and gas reservoir beneath the surface of the ground.

7. The difference in pressure between the oil and gas reservoir beneath the ground and the surface causes some lighter hydrocarbon constituents in the petroleum to change from a liquid state to a gaseous state as the petroleum is lifted toward the surface with the result that Plaintiff recovers oil and gas.

8. Liquid petroleum lifted from a reservoir has many hydrocarbon constituents, but only some of the lighter constituents, such as methane, may become gas as a result of the change in pressure as the petroleum is lifted from the oil and gas reservoir beneath the ground to the surface.

10. The temperature difference between the oil and gas reservoir beneath the ground and the surface causes some hydrocarbon constituents in the petroleum to condense from a gaseous state and become liquid petroleum.

12. The physical changes of state from liquid to gas and gas to liquid are directly caused by differences in pressure and temperature that result from lifting the petroleum to the surface.

13. The change of pressure and temperature intervenes to directly cause some, but not all, of the hydrocarbon constituents in the petroleum to change from either a liquid to a gas, or a gas to a liquid, beneath the surface of the ground.

14. The Equipment is merely an indirect cause of the changes in physical state that occurs to some of the hydrocarbon constituents in the petroleum.

### II. CONCLUSIONS OF LAW

2. Changes from liquid to gas and from gas to liquid are "physical changes" within the meaning of Tex. Tax Code § 151.318.

3. Physical change occurs when petroleum is brought to the surface of the ground.

4. Proof that a physical change has occurred to petroleum when it is brought to the surface is insufficient to establish that the manufacturing exemption in Tex. Tax Code § 151.318 applies because what must be shown is that the Equipment directly causes the physical change to the petroleum.

5. "Direct" implies a close link with no intervening causes.

6. The direct cause of the physical change is the change in pressure and/or temperature.

7. The Equipment is merely an indirect cause of the physical changes.

3    Amicus briefs were submitted in support of Southwest's position by Texas Association of Business, Texas Aggregates and Concrete Association, and Texas Mining and Reclamation Association; EOG Resources; Texas Oil and Gas Association; and the Texas Public Policy Foundation.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

APPENDIX F - Townsend v. Terrell, 16 S.W.2d 1063 (Tex. 1929)

118 Tex. 463

Commission of Appeals of Texas, Section B.

Townsend, Dist. Atty.

v.

Terrell, State Comptroller et al.

No. 1066—5366
|
May 22, 1929

**Synopsis**

Original application for writ of mandamus by Sam H. Townsend, District Attorney, against Sam H. Terrell, State Comptroller, and others. Writ granted.

West Headnotes (6)

**[1]**    **Statutes** 👈 Implied Repeal

Repeals by implication are not favored.

5 Cases that cite this headnote

**[2]**    **Statutes** 👈 In pari materia

All acts and parts of acts in pari materia are to be construed as a whole.

5 Cases that cite this headnote

**[3]**    **Statutes** 👈 By inconsistent or repugnant statute

Repeal by implication will be indulged only where acts are so inconsistent as to be irreconcilable.

5 Cases that cite this headnote

**[4]**    **Statutes** 👈 By inconsistent or repugnant statute

Acts being irreconcilable, presumption of intention to repeal all laws and parts thereof in conflict with clear intention of last act exists.

6 Cases that cite this headnote

**[5]**    **Statutes** 👈 General and specific statutes

Specific statute controls over general statute where conflicting.

7 Cases that cite this headnote

**[6]**    **District and Prosecuting Attorneys** 👈 Nature and functions of office

Act abolishing office of district attorney for Second judicial district held repealed by later inconsistent act recreating such office, Gen. & Sp.Acts 40th Leg., 1927, c. 127, and c. 151.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*464**  W. J. Townsend and J. J. Collins, both of Lufkin, for relator.

Claude Pollard, Atty. Gen., and H. Grady Chandler and R. D. Cox, Asst. Attys. Gen., for respondents.

**Opinion**

**\*465**  SPEER, J.

This is an original application for a writ of mandamus to compel the state comptroller to issue to relator salary warrants as district attorney for the Second Judicial district. Relator has been duly elected to the office of district attorney for the Second district and is entitled to the writ sought, unless the office has been abolished by the Act of the Fortieth Legislature which we shall immediately notice.

By an act approved March 22, 1927, the Fortieth Legislature passed the following bill:

"Section 1. The office of District Attorney in the Second Judicial District of Texas is hereby abolished and the County Attorney of each county composing said district, to wit: Angelina, Cherokee, and Nacogdoches Counties, shall represent the State of Texas in all matters wherein the State of Texas is a party in his respective county, and shall receive such fees and compensation for his services as is now, or may hereafter, be provided by the General Laws of the State of Texas.

**\*466** "Sec. 2. All laws, or parts of laws, in conflict herewith are hereby repealed.

"Sec. 3. This act shall become and be effective on and after January 1, 1929." Gen. and Spec. Laws, 1927, p. 195.

After the passage of the above act, the same Legislature passed the following:

"Section 1. That Article 322 of the Revised Civil Statutes of 1925 be amended so that same shall hereafter read as follows:

"Article 322. The following Judicial Districts in this State shall each respectively elect a district attorney, viz.: first, second, third, fourth, fifth, seventh, eighth, ninth, twelfth, twenty-first, twenty-second, twenty-third, twenty-fourth, twenty-fifth, twenty-seventh, twenty-ninth, thirtieth, thirty-first thirty-second, thirty-third, thirty-fourth, thirty-fifth, thirty-sixth, thirty-seventh, thirty-eighth, thirty-ninth, fortieth, forty-second, forty-sixth, forty-seventh, forty-ninth, fiftieth, fifty-first, fifty-second, fifty-third, sixty-third, sixty-fourth, sixty-ninth, seventieth, seventy-second, seventy-fifth, seventy-sixth, seventy-seventh, seventy-ninth, eighty-first, eighty-third, nintieth, hundred, hundred and sixth. There shall also be elected a criminal district attorney for Harris County, a criminal district attorney for Dallas County, a criminal district attorney for Tarrant County, and one criminal district attorney for the Counties of Nueces, Kleberg, Kennedy, Willacy and Cameron.

"Sec. 2. The fact that many district courts try only civil cases and have no need for a district attorney and the further fact that many judicial districts overlap and the further fact, that may counties constitute several judicial districts and the law now requires the election of a district attorney for each district, and the fact that to provide a district attorney in every judicial district, in the State, would cause a needless expenditure of funds and the fact that no district attorney has been elected in any district except those **\*\*1064** named in this Act, create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each House be suspended, and said rule is hereby suspended, and that this Act shall take effect and be in force from and after its passage, and it is so enacted.

"Approved March 25, 1927.

"Effective March 25, 1927." Gen. and Spec. Laws, 1927, p.222.

It is the contention of relator that the last act prevails and by necessary implication repeals the first one abolishing the office of **\*467** district attorney for the Second Judicial district, while it is the contention of respondents that the two acts are not necessarily inconsistent, but that both may stand and do stand as valid enactments.

**[1]** **[2]** **[3]** **[4]** It will be observed that in the amendment approved March 25, 1927, there is no express repeal of the abolishing act approved March 22d. It is well settled that repeals by implication are not favored, and that all acts and parts of acts in pari materia are to be construed as a whole and interpreted in such manner as that all may stand where such may reasonably be done. It is only where acts are so inconsistent as to be irreconcilable that a repeal by implication will be indulged. If there exists such conflict, then there is a presumption of the intention to repeal all laws and parts of laws in conflict with the clear intention of the last act. This is necessarily true where both acts cannot stand as valid enactments.

**[5]** This rule of construction has found frequent and apt illustration where one of the supposedly conflicting statutes was general in its terms and the other specific. In such a case it is universally held that the specific statute more clearly evidences the intention of the Legislature than the general one, and therefore that it will control. In such a case both statutes are permitted to stand—the general one applicable to all cases except the particular one embraced in the specific statute. It is this rule of construction and the line of decisions supporting it that are urged upon us by respondents. Perhaps the latest case in point is Fortinberry v. State (Tex. Com. App.) 283 S. W. 147. There a specific statute, which declared that no person shall be eligible to the office of mayor unless he possesses the qualifications of an elector and shall have resided *12 months* next preceding the election within the limits of the city, would control a general statute that no person shall be eligible to any state, county, precinct, or municipal office in this state unless he shall have resided in this state for the period of 12 months and *6 months* in the county, precinct, or *municipality* in which he offers as a candidate next preceding the election, but that both would stand.

**[6]** But the rule there applied and here invoked can have no application, for the reason that both statutes involved are specific with respect to the office of district attorney for the Second Judicial district, for in both the particular office is expressly mentioned—the first act abolishing it, and the second one recreating it. Both acts cannot be valid at the same

time. They are thoroughly inconsistent and irreconcilable. Under such circumstances the last act must prevail. That the act of March 25th recreating the office of district **\*468** attorney for the Second Judicial district likewise embraced other district attorneyships can make no difference. It is nevertheless definitely specific as to each office created. Such fact does not make it a general law within the rule of construction being considered. To hold that the office of district attorney for the Second Judicial district has been abolished would be to strike down a specific provision of the latter act requiring the election of a district attorney for that district. This would be destruction and not construction at all.

It will be noticed the abolishing act was not to go into effect until after January 1, 1929. As matter of law, we know that our biennial elections occur in the even years, and that a district attorney was required, under the then existing law, to be elected for the Second Judicial district in 1928. If the act of 1927 amending ⚑article 322 could be interpreted as requiring the election of a district attorney for the Second district at the biennial election in 1928, for the one year which could exist and did exist, under the abolishing act, then it would be our duty to uphold both acts, for there would be no conflict. But this interpretation cannot be indulged. The unmistakable language of the amendment requires the election of a district attorney in each of the judicial districts named, and such requirement means necessarily precisely the same thing as to each of the many districts mentioned. There would be no justification for giving the act one meaning in the Second district and altogether a different meaning in the other districts named. Indeed, to give to the amending act such a perverted interpretation would be to make the act mean one thing in 1928 and altogether a different thing in subsequent election years, although there had in the meantime been no legislative amendment, even as to the Second district. The amending act had exactly the same meaning when it was passed as it has today, and will have at all times in the future, unless repealed or amended by an act of the Legislature passed subsequent to its enactment.

We therefore recommend that the writ of mandamus do issue in accordance with the prayer of the relator.

CURETON, C. J.

The opinion of the Commission of Appeals is adopted, and mandamus awarded.

**All Citations**

118 Tex. 463, 16 S.W.2d 1063

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX G - Tex. Tax Code § 112.154

Vernon's Texas Statutes and Codes Annotated
　Tax Code (Refs & Annos)
　　Title 2. State Taxation (Refs & Annos)
　　　Subtitle B. Enforcement and Collection (Refs & Annos)
　　　　Chapter 112. Taxpayers' Suits (Refs & Annos)
　　　　　Subchapter D. Suit for Tax Refund

V.T.C.A., Tax Code § 112.154

§ 112.154. Trial De Novo

Currentness

In a suit under this subchapter, the issues shall be tried de novo as are other civil cases.

**Credits**

Acts 1981, 67th Leg., p. 1517, ch. 389, § 1, eff. Jan. 1, 1982.

V. T. C. A., Tax Code § 112.154, TX TAX § 112.154

Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mary Lou Swanson on behalf of Kelsey Hanson
Bar No. 24096654
marylou.swanson@oag.texas.gov
Envelope ID: 100298514
Filing Code Description: Response
Filing Description: 20250430 Appellants Reply Brief
Status as of 4/30/2025 5:00 PM CST

Associated Case Party: ChampionX, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Deborah Sloan | 786230 | dsloan@jonesday.com | 4/30/2025 4:51:25 PM | SENT |
| Carla Dennis | | cydennis@jonesday.com | 4/30/2025 4:51:25 PM | SENT |
| John MAllan | | jmallan@jonesday.com | 4/30/2025 4:51:25 PM | SENT |
| Antoinette L.Ellison | | aellison@jonesday.com | 4/30/2025 4:51:25 PM | SENT |

Associated Case Party: Ken Paxton, Attorney General of the State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kelsey Hanson | 24096654 | kelsey.hanson@oag.texas.gov | 4/30/2025 4:51:25 PM | SENT |